125 F.3d 1296
 97 Cal. Daily Op. Serv. 7546, 97 Daily Journal
D.A.R. 12,161
John CHANDLER, Jr., Plaintiff-Appellant,
v.
The UNITED STATES ARMY; Kenneth Simpson, in his capacity as
Commander, U.S. Army Recruiting Command,
Defendants-Appellees.
 No. 95-35882.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 7, 1996.
Decided Sept. 23, 1997.
 
 Daniel L. Hawkley, Boise, ID, for plaintiff-appellant.
 Warren S. Debridge, Assistant United States Attorney, Boise, ID, for defendants-appellees.
 Appeal from the United States District Court for the District of Idaho; Edward J. Lodge, District Judge, Presiding. D.C. No. CV-94-00243-EJL.
 Before: ALARCON, NORRIS and KLEINFELD, Circuit Judges.
 KLEINFELD, Circuit Judge.
 
 
 1
 This is an action for declaratory and injunctive relief under a federal statute prohibiting wiretapping.
 
 FACTS
 
 2
 This case was resolved on summary judgment, so the true facts have not been determined. Thus, our review treats the evidence in the light most favorable to Captain Chandler to determine whether there are genuine issues of material fact, and whether the law as applied to the facts so construed entitled the prevailing party to judgment.
 
 
 3
 Captain Chandler and his wife were having marital problems, and he had filed for a divorce. Mrs. Chandler bought and set up electronic equipment to record her husband's telephone conversations without his knowledge. She recorded him talking to Julie Ann Kelch, a Sergeant in the Army with whom Captain Chandler had professional contact. Mrs. Chandler listened to the tape and reached the conclusion that her husband was having an affair with Sergeant Kelch.
 
 
 4
 Mrs. Chandler then took two actions to retaliate against her husband. She falsely charged him with rape at the sheriff's office, and she told his commanding officer that he was having an affair, and that she had a tape recording that proved it. In her affidavit, she admitted that:
 
 
 5
 M. In addition to making a false claim to the police alleging that my husband had raped me, I called my husband's commander [Lieutenant Colonel] Hays and told him that I believed my husband was having an affair with Sgt. Kelch;
 
 
 6
 N. He asked if I had any evidence of that, and I told him I had a tape recording of a telephone conversation as proof of my allegation, and further told him that our telephone records showed that my husband spoke frequently with Sgt. Kelch using our home phone;
 
 
 7
 O. After going to the first Sgt.'s house and making a couple of copies of the tape recording, I gave my original copy to the Ada County Deputy Sheriff investigating my claim that my husband had raped me;
 
 
 8
 The next day Mrs. Chandler talked to a lawyer, who told her that secretly recording a telephone conversation between two other people was illegal. Mrs. Chandler then called Colonel Hays and told him what her lawyer had said. Colonel Hays "told me that the Army could still use it because civilian law did not apply to the Army." Aff. of Delores Chandler, pp m, n. Mrs. Chandler then destroyed her copies of the tape and got her original back from the sheriff's office. But the sheriff's office had made a copy of the tape, and had given the copy to Colonel Hays. Colonel Hays assigned Major David F. Gilbert to investigate. Major Gilbert was investigating allegations of conduct unbecoming an officer, adultery, fraternization, and conduct unbecoming a noncommissioned officer.
 
 
 9
 Major Gilbert's report was submitted to Captain Chandler for rebuttal, in accord with Army regulations for investigations where adverse administrative action is contemplated against an individual. Captain Chandler's attorney claimed that the use of the tape violated a federal wiretapping statute.
 
 
 10
 The Army responded to Captain Chandler's lawyer's argument by having a different commanding officer, Colonel Richard L. Teters, Jr. appoint a different investigator, Major Gregory A. Guren, to conduct an investigation untainted by the tape. Colonel Teters did not listen to it or otherwise acquaint himself with the contents. Major Guren investigated the complaint again without obtaining the tape or asking questions about it. We cannot tell from the record whether Major Guren actually talked to anyone, or just reread the materials Major Gilbert had compiled, with the descriptions of the contents of the tape blacked out. Major Gilbert concluded that Captain Chandler "had engaged in an improper personal relationship" with Sergeant Kelch, and recommended that Captain Chandler be relieved of his command, reprimanded, and removed from the promotion list. Captain Chandler has received a formal written reprimand, been relieved of command for cause, and has been subjected to other adverse action.
 
 
 11
 Captain Chandler sued for a declaratory judgment that any use of any information from the tape violated federal law, and for an injunction that all records referring to the tape be destroyed. He also sought a declaration that any recommendation based in whole or in part on use of the recorded telephone conversations violated federal law. The wiretapping statute provides for declaratory and equitable relief for a person whose electronic communication is intercepted or used in violation of the law. 18 U.S.C. § 2520(b)(1).
 
 
 12
 The district court concluded that disclosure and use of the tape by the Army did not violate the federal wiretapping statutes, because the exception for law enforcement use in 18 U.S.C. § 2517 allowed use of the tape, and the second investigation, by Major Guren, was as a matter of law untainted by the tape.
 
 ANALYSIS
 
 13
 The federal wiretapping statute goes further to protect privacy than the Fourth Amendment. "Except as expressly authorized ... all interceptions of wire and oral communications are flatly prohibited. Unauthorized interceptions and the disclosure or use of information obtained through unauthorized interceptions are crimes ... Title III also bars the use as evidence before official bodies of the contents and fruits of illegal interceptions...." Gelbard v. United States, 408 U.S. 41, 46, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972). The legislative purpose is plain: "The protection of privacy was an overriding congressional concern." Id. at 48, 92 S.Ct. at 2361.
 
 
 14
 Unlike Fourth Amendment limitations on searches, the wiretapping statute applies even to evidence obtained by entirely private misconduct. Cf. Burdeau v. McDowell, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). The limitation on use turns on improper interception, under 18 U.S.C. § 2515, regardless of whether the interception was governmental or private. Gelbard expressly rejects the proposition that wire tapping evidence can be used after "the invasion of privacy is over and done with." Gelbard, 408 U.S. at 51, 92 S.Ct. at 2363.
 
 
 15
 1. Was use of the tape a violation?
 
 
 16
 The Army argues that use of the tape was permissible under the law enforcement exceptions in the wiretapping statute, 18 U.S.C. § 2517(1), (2). The statute provides for criminal and civil actions against "any person who ... intentionally uses ... any ... device to intercept any oral communication" such as a telephone call. 18 U.S.C § 2511(1)(b). There are a large number of carefully drafted statutory exceptions for switchboard operators, foreign intelligence monitoring, FCC enforcement, citizens band radio, marine communications, etc. 18 U.S.C. § 2511. It is undisputed in this case, though, that Mrs. Chandler's surreptitious taping of her husband's telephone conversations with Sergeant Kelch violated the statutory command that no person may, "intentionally use[ ] ... any electronic ... device to intercept any oral communication...." 18 U.S.C. § 2511(1)(b).
 
 
 17
 If the facts are as Captain Chandler's evidence says, the Army violated the statute, not just Mrs. Chandler. The statute prohibits use of information others have obtained by wiretapping, not just the wiretapping itself. Unless an exception applies, no one may intentionally use or disclose the contents of an electronic communication, knowing or having reason to know that the information was obtained by a violative interception, regardless of whether the user procured the interception. 18 U.S.C. §§ 2511(1)(c), (d):
 
 
 18
 Section 2511. Interception and disclosure of wire, oral or electronic communications prohibited.
 
 
 19
 (1) Except as otherwise specifically provided in this chapter any person who-
 
 
 20
 . . . . .
 
 
 21
 (c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;
 
 
 22
 (d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic communication knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.
 
 
 23
 . . . . .
 
 
 24
 ... shall be punished as provided in subsection 4 or shall be subject to suit as provided in subsection 5.
 
 
 25
 If Mrs. Chandler's affidavit were proved, then Colonel Hays and perhaps Major Gilbert would have violated the statute. Colonel Hays would have "intentionally disclosed ... to [Major Gilbert] ... the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through [Mrs. Chandler's] interception of a wire, oral, or electronic communication in violation of this subsection." 18 U.S.C. § 2511(1)(c). Colonel Hays and Major Gilbert would have "intentionally use[d]" Mrs. Chandler's interception during the first investigation of Captain Chandler. Colonel Hays and possibly Major Gilbert would have had reason to know that the tape was obtained in violation of the wiretapping law, because Mrs. Chandler told Colonel Hays it was, and even told him that her lawyer said the taping was illegal, to which he replied "that the Army could still use it because civilian law did not apply to the Army." There is no exception in the law for the Army.
 
 
 26
 The statute includes an elaborate scheme of exceptions providing for law enforcement wiretapping, but they are hedged in by safeguards. 18 U.S.C. §§ 2516-2518. The question the Army poses is whether the law enforcement exceptions in 18 U.S.C. § 2517 take its use of the tape out of section 2511. Section 2517 draws a distinction between disclosure and use, on the one hand, and testimony, on the other.[1] Subsections (1) and (2) allow law enforcement officials to disclose and use the contents of a wiretap if they become aware of the contents "by any means authorized by this chapter." 18 U.S.C. § 2517(1), (2). Subsection (3) allows law enforcement officials to testify in a proceeding under oath about the contents of a wiretap, but only so long as they received their knowledge "by any means authorized by this chapter" and the wiretap evidence was "intercepted in accordance with the provisions of this chapter." The first phrase, "by any means authorized ...", is in all three sections, but the second, "intercepted in accordance ...", is only in the third subsection.
 
 
 27
 The Army correctly argues that the words in subsection (3), "intercepted in accordance with this chapter," cannot be treated as surplusage. We must infer that Congress imposed that condition, "intercepted in accordance ...", only for disclosure in testimony, not for disclosure and use among law enforcement officers under subsections (1) and (2). In this, we agree with the Fifth Circuit's analysis in Forsyth v. Barr, 19 F.3d 1527, 1543 (5th Cir.1994).
 
 
 28
 But the principle underlying the Army's correct argument, that a statutory condition should not be read as surplusage, applies to the other condition too. For the same reason that we cannot disregard the phrase in subsection three, "intercepted in accordance ...", we cannot disregard the express condition in all three subsections, that law enforcement officers obtain their knowledge "by any means authorized ..." We must read the statute in a way that makes that condition effective for all three subsections, while requiring that the communication be "intercepted in accordance ..." only for testimony.
 
 
 29
 We cannot find, and the Army does not suggest, any provision pursuant to which Colonel Hays and Major Gilbert obtained knowledge of the contents of Mrs. Chandler's wiretap "by any means authorized by this chapter." Are there ways in which a law enforcement officer could obtain knowledge of the contents of a wiretap by authorized means, even though the interception was not in accordance with the chapter? If not, then the distinction we draw would be meaningless, but if so, the distinction must be given effect.
 
 
 30
 There are situations where law enforcement officers could gain knowledge of the contents of a wiretap by authorized means, even though the interception was not in accordance with the law. One way is lack of scienter. The general prohibition quoted above conditions illegality of use on "knowing or having reason to know that the information was obtained through the interception of a ... communication in violation of this subsection." 18 U.S.C. § 2511(1)(c), (d). That implies that if the law enforcement officer gains knowledge of the contents of the wiretap, without knowing that it was obtained by a violative interception, then the officer has obtained knowledge by an authorized means.
 
 
 31
 Suppose hypothetically that Mrs. Chandler had falsely told Colonel Hays that her husband recorded all his own calls, and she had merely taken his tape, recorded with his knowledge, out of their answering machine and copied it. Then Colonel Hays's obtaining knowledge of what Captain Chandler said on the tape would be authorized; his ignorance of the illegal wiretapping would avoid violation of 18 U.S.C. §§ 2511(1)(c) and (d). The non-violative obtaining of knowledge under § 2511 would imply permitted use and disclosure under § 2517(1) and (2). Yet § 2517(3) would still bar testimony, if the trier of fact concluded that Mrs. Chandler had lied and Captain Chandler had not consented to the recording.
 
 
 32
 The statute also provides another explicit provision laying out a way that knowledge of the contents of an intercepted communication can be authorized by the chapter, even when the communication was not intercepted in accordance with the chapter. This provision is at 18 U.S.C. § 2518(7). That provision says certain officials "may intercept" communications in an emergency without a court order, provided that one is quickly applied for. But if the application is denied, or the interception is terminated without an order having been issued, then "the contents of any ... communication intercepted shall be treated as having been obtained in violation of this chapter...." 18 U.S.C. § 2518(7). This situation--emergency, interception, denial of a court order or termination of the wiretap without a court order--precisely fits the distinction drawn in 18 U.S.C. § 2517. Subsections (1) and (2) say that the officers' disclosure to each other and use is permissible, because the knowledge of the contents of the intercepted communication was obtained by "means authorized by this chapter," an emergency wiretap. Yet by explicit provision of the emergency wiretap subsection quoted, the contents have to be treated as "having been obtained in violation of this chapter," invoking the limitation in subsection (3) of 18 U.S.C. § 2517.
 
 
 33
 This parsing of "by any means authorized" and "intercepted in accordance" as used in the statute makes literal and practical sense of all its words. We have identified cases falling within the first but not the second condition, so our construction is logical. We therefore reject the Army's argument that law enforcement authorities can unconditionally disclose and use communications they know to have been intercepted illegally, so long as they do not introduce them as evidence in a proceeding with a judge who can grant motions to suppress. That construction fails, because it would render superfluous the language in subsections (1) and (2) of 18 U.S.C. § 2517, "by any means authorized by this chapter, has obtained knowledge."
 
 
 34
 The Army urges that the construction adopted above would set up an intercircuit conflict with a Fifth Circuit case, Forsyth v. Barr, 19 F.3d 1527, 1543 (5th Cir.1994). That is incorrect, because Forsyth is analogous to the hypothetical case offered above, where Mrs. Chandler deceived Colonel Hays into thinking the tape was lawfully made by her husband, instead of telling him she had unlawfully intercepted it. In Forsyth, the informant who told the police officer the contents of the intercepted phone conversations "told [him] that a wiretap was not involved, and [the police officer] believed that the telephone had become a party line accidentally." Id. at 1531. By the time the police learned that they had been given the contents of illegally wiretapped phone calls, the investigation was nearly complete. The Army would have us read Forsyth more broadly, as meaning that use and disclosure among law enforcement officers is unrestricted, so long as the evidence is not introduced in an adversary proceeding. But Forsyth expressly limits its holding to "the unique facts and circumstances of this case," id. at 1545, and is, as we have explained, not in conflict with our construction of the statute. We agree with the Fifth Circuit that if the police innocently receive what is in fact the contents of illegally intercepted communications, they may use and disclose it among themselves. See id. at 1544. That does not conflict with our conclusion, that if law enforcement officers gain knowledge of the contents of an intercepted communication, aware of the unlawful interception, they may not use and disclose it.
 
 
 35
 Forsyth treats the statute as ambiguous and looks to the legislative history, a step we need not take because of our analysis of the "having been obtained in violation of this chapter" clauses in 18 U.S.C. §§ 2517(1) and (2). See Forsyth, 19 F.3d at 1544. We set out in the margin all the relevant language, in the Senate Report on the Omnibus Crime Control and Safe Streets Act of 1968.[2] It does not conflict with the construction we have made of the language in the statute, though the report is largely directed to other concerns and speaks to other problems. The legislative example of using and disclosing an illegally intercepted communication to prosecute the wiretapper himself is properly dealt with, as United States v. Gris, 146 F.Supp. 293 (S.D.N.Y.1956), affirmed, 247 F.2d 860 (2d Cir.1957), did: the purpose of the statute is to protect persons talking on the phone from interception, so the illegal interceptor has no standing to invoke the act as a shield for his own violation.
 
 
 36
 Our reading is consistent with that of the First Circuit. United States v. Vest, 813 F.2d 477, 480-81 (1st Cir.1987), rejects the argument that the government is free to use an illegal intercept so long as it did not participate in the illegal interception. The reason is that the statute "makes illegal not only unauthorized interceptions but also the disclosure and use of information obtained through such interceptions," and the Supreme Court has rejected "the Government's assertion that the invasion of privacy is over and done with" once the wiretapping is over. Gelbard v. United States, 408 U.S. 41, 52, 92 S.Ct. 2357, 2363, 33 L.Ed.2d 179 (1972), discussed in Vest, 813 F.2d at 481.
 
 
 37
 We are unable to avoid an intercircuit conflict, because the Sixth Circuit has rejected the First Circuit's position in Vest. In United States v. Murdock, 63 F.3d 1391 (6th Cir.1995), the Sixth Circuit recognized a clean hands exception to 18 U.S.C. § 2515, allowing introduction of evidence obtained by an illegal private wiretap where the government "took no part in the interceptions." Id. at 1404. The reason was that recognition of a clean hands doctrine "would not create the problem of government agents encouraging violations." Id. at 1402. We disagree with Murdock for two reasons. First, the purpose of the statute is to prevent private, not just governmental, wiretapping. Second, we cannot reconcile the Sixth Circuit reading with the statutory language. It may be that the intercircuit conflict will be obviated, because the Sixth Circuit is reconsidering a recent application of Murdock en banc. Doe v. Securities and Exchange Commission, 86 F.3d 589 (6th Cir.1996).
 
 
 38
 Thus we conclude that the summary judgment in favor of the Army on Captain Chandler's claim that the first investigation violated the wiretapping act must be reversed.
 
 2. Major Guren's Investigation
 
 39
 Though not conceding its correctness, the Army sought to obviate the effect of any illegality of Mrs. Chandler's wiretapping by means of a second investigation. A different commanding officer, Colonel Teters, directed a different investigator, Major Guren, to conduct a new investigation without reliance on the contents of the tape. We have concluded that the tape was a product of an illegal interception, and the Army did not obtain knowledge of its contents by a means authorized by the statute, so "no part of the contents of [the recorded telephone calls] and no evidence derived therefrom" 18 U.S.C. § 2515, could properly be used against Captain Chandler.
 
 
 40
 Major Guren recommended discipline against Captain Chandler based on his finding that Captain Chandler "had engaged in an improper personal relationship that had an adverse affect on the good order and discipline of the unit." It is not clear to us whether the focus of the investigation was on whether Captain Chandler committed adultery with Sergeant Kelch, or fraternized in a non-sexual way with her. The investigation was initiated because of Mrs. Chandler's accusation of adultery. Major Gilbert's interviews appear to have focused on the alleged sexual aspects of the relationship, and Captain Chandler submitted an affidavit that "at no time have I ever been involved in a sexual or romantic relationship with Sergeant Kelch." Major Guren's finding in the second investigation, of an "improper" relationship, is ambiguous as to whether the impropriety was adultery or fraternization. Because we draw all reasonable inferences in Captain Chandler's favor in evaluating the summary judgment, we assume for purposes of this decision that adultery was at least part of the basis for the investigative finding.
 
 
 41
 The evidence on summary judgment establishes without contradiction that Major Guren and Colonel Teters did not listen to the tape, but is ambiguous as to whether their investigation and conclusions were affected by knowledge of what was on the illegally obtained tape. Colonel Teters' affidavit says that he has not "listened to the tape" or "read a verbatim transcript of the contents," but does not say that he is ignorant of what is on the tape. Major Guren's affidavit is stronger, saying that the Army legal advisor told him "I was not to seek out such a tape nor ask questions reference any such tape of witnesses .... at no time was I aware of the contents of any tape between Captain Chandler and Sergeant Kelch nor did my knowledge that such a tape may exist in any way influence my findings and recommendations."
 
 
 42
 But the materials Major Guren read say that there was a tape, and imply that the tape corroborated the accusations of adultery. The record is ambiguous as to just what Major Guren did to investigate--his affidavit does not say whether he talked to anyone, or just read the reports from the first investigation, and it does not say whether he read the police report from Mrs. Chandler's false rape accusation. Captain Chandler's affidavit says he was given a copy of Major Guren's investigative report, which included the witness statements obtained by Major Gilbert in the first investigation with marker obscuring words disclosing the contents of the tape. The police report, which appears from the blacking out likely to have been part of Major Guren's investigative report, says "Mrs. Chandler told me that she had proof:" followed by a blacked out portion, and "when Delores returned home she listened to the tape which indicated John was" followed by a blacked out portion.
 
 
 43
 Though Major Guren's report suggests that he may have meant "impropriety" to mean adultery, without the tape his evidence might not suffice to establish adultery. Captain Chandler was stationed in Boise, and had responsibilities relating to the Idaho Falls recruiting station, where Sergeant Kelch was stationed. The station commander at Idaho Falls said that Sergeant Kelch had made sexual advances toward him, said openly in the hearing of others that she was very desirous of sex generally, and had in view of others simulated fellatio on a Pepsi bottle. The station commander also said that Captain Chandler had visited the station almost weekly and had spent the entire time during his visits alone with Sergeant Kelch and "Captain Chandler's attention to Sergeant Kelch was causing a morale problem in the station." The police report said that Captain Chandler had felt extreme stress on account of productivity at work and severe marital problems, "freely admitted that his conduct with Sergeant Kelch didn't look good, but that there was nothing sexually going on between them. Captain Chandler admitted to using Sergeant Kelch as a sounding board or confidant."
 
 
 44
 Taking all inferences in his favor, we cannot conclude on summary judgment that this evidence sufficed to establish adultery. Captain Chandler denied adultery. That Sergeant Kelch made sexually inviting remarks to other men does not prove that she would feel the same way about Captain Chandler. Nor can it be assumed that he would have accepted her invitation had it been made. Major Guren had plenty of evidence for fraternization, but a very thin case for adultery--nothing but a sexually aggressive woman, at least verbally, alone with a man who was not getting along with his wife.
 
 
 45
 The statute says that "no part of the contents" of an improperly intercepted communication "and no evidence derived therefrom" may be received in evidence in any proceeding:
 
 
 46
 Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom any be received in evidence in any trial, hearing, or other proceeding in or before nay court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter.
 
 
 47
 18 U.S.C. § 2515. The contents of Captain Chandler's intercepted communication were not received into evidence in Colonel Teter's and Major Guren's investigation. The contents were blocked out with marker in the statements used. But the record leaves open a genuine issue of fact as to whether "evidence derived therefrom" was received.
 
 
 48
 Congress expressly adopted a "the fruit of the poisonous tree" doctrine for wiretap evidence: "No evidence derived therefrom may be received in evidence...." 18 U.S.C. § 2515; see Gelbard v. United States, 408 U.S. 41, 46, 92 S.Ct. 2357, 2360, 33 L.Ed.2d 179 (1972); United States v. Spagnuolo, 549 F.2d 705, 711 (9th Cir.1977). This prohibition is intended to be broad enough "so that the courts do not become partners to illegal conduct," by protecting "the integrity of court and administrative proceedings." Gelbard, 408 U.S. at 51, 92 S.Ct. at 2362.
 
 
 49
 We look to illegal search and seizure cases as an analogy, to determine the meaning of the well established term of art, "evidence derived therefrom." The fruit of the poisonous tree doctrine is not so broad as to exclude evidence that would not have been discovered but for the wiretap. See Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). "Evidence derived" from an illegal wiretap is "the product of the primary evidence, or that is otherwise acquired as an indirect result of the [wiretap], up to the point at which the connection with the [wiretap] becomes 'so attenuated as to dissipate the taint.' " Murray v. United States, 487 U.S. 533, 537, 108 S.Ct. 2529, 2533, 101 L.Ed.2d 472 (1988). We look to Murray, a search and seizure case, for guidance, because Gelbard teaches us that the statutory phrase "evidence derived therefrom" imports the fruit of the poisonous tree doctrine used in search and seizure cases. If the evidence is derived from an independent source, not the wiretap, then it can be used. Murray, 487 U.S. at 537-38, and 542 n. 3, 108 S.Ct. at 2533-34, and 2536 n. 3; see also United States v. Reed, 15 F.3d 928, 933 (9th Cir.1994). The government cannot profit from the illegal wiretap, whether private or public, but cannot be put into a worse position than it would have occupied had the wiretap not taken place. Murray, 487 U.S. at 541, 108 S.Ct. at 2535.
 
 
 50
 The record is not sufficient to establish just what the second investigation consisted of, what it found, or whether the finding was "derived from" the wiretap in the prohibited sense. We therefore must reverse the summary judgment dismissing Captain Chandler's claim arising out of the second investigation, because there is a genuine issue of fact as to whether the evidence used was derived from the illegal wiretap.
 
 
 51
 REVERSED.
 
 
 
 [1]
 Section 2517 reads, in its entirety:
 § 2517. Authorization for disclosure and use of intercepted wire, oral, or electronic communications
 (1) Any investigative or law enforcement officer who, by means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.
 (2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may use such contents to the extent that such use is appropriate to the proper performance of his official duties.
 (3) Any person who has received, by any means authorized by this chapter, any information concerning a wire, oral, or electronic communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof.
 (4) No otherwise privileged wire, oral, or electronic communication intercepted in accordance with, or in violation of, the provisions of this chapter shall lose its privileged character.
 (5) When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as provided in subsections (1) and (2) of this section. Such contents and any evidence derived therefrom may be used under subsection (3) of this section when authorized or approved by a judge or competent jurisdiction where such a judge finds on subsequent application that the contents were otherwise intercepted in accordance with the provisions of this chapter. Such application shall be made as soon as practicable.
 (Emphasis added).
 
 
 [2]
 Section 2517 of the new chapter authorizes the use and disclosure of intercepted wire or oral communications in specified circumstances. Section 2517 must, of course, be read in light of section 2518
 Paragraph (1) authorizes any investigative or law-enforcement officer as defined in section 2510(7), who, by any means authorized in this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom to disclose the contents to other investigative or law-enforcement officers. The proposed provision envisions close Federal, State, and local cooperation in the administration of justice. The utilization of an information-sharing system within the law-enforcement community circumscribed by suitable safeguards for privacy is within the intent of the proposed legislation. Examples of existing systems include the law-enforcement intelligence unit established in California in 1956, the New England State Police compact (see R.I. Gen Laws Ann § 42-37-1 to 3 (Supp.1965)), the New York State identification and intelligence system, and the National Crime Information Center. Only disclosure that is appropriate to the proper performance of the official duties of the officers making and receiving the disclosure may be made.
 Paragraph (2) authorizes any investigative or law-enforcement officer who, by any means authorized in this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom to use it. Only use that is appropriate to the proper performance of official duties may be made. The proposed provision envisions use of the contents of intercepted communications, for example, to establish probable cause for arrest (Ginsberg v. United States, 96 F.2d 433 (5th Cir.1938)), to establish probable cause to search (Foley v. United States, 64 F.2d 1(5th), certiorari denied, 289 U.S. 762, 53 S.Ct. 796, 77 L.Ed. 1505 (1933)), or to develop witnesses. (In re Saperstein, 30 N.J.Super. 373, 104 A.2d 842 (1954), certiorari denied 348 U.S. 874, 75 S.Ct. 110, 99 L.Ed. 688 (1954); New York v. Saperstein, 2 N.Y.2d 210, 159 N.Y.S.2d 160, 140 N.E.2d 252 (1957)). Neither paragraphs (1) nor (2) are limited to evidence intercepted in accordance with the provision of the proposed chapter, since in certain limited situations disclosure and use of illegally intercepted communications would be appropriate to the proper performance of the officers' duties. For example, such use and disclosure would be necessary in the investigation and prosecution of an illegal wiretapper himself. (See United States v. Gris, 146 F.Supp. 293 (S.D.N.Y.1956), affirmed 247 F.2d 860 (2d Cir.1957)).
 Paragraph (3) authorizes any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication or evidence derived therefrom intercepted in accordance with the provisions of the proposed chapter to disclose the contents of that communication or evidence derived therefrom while giving testimony. It envisions, of course, the use and disclosure of such evidence at trial to establish guilt directly (New York v. Saperstein, 2 N.Y.2d 210, 159 N.Y.S.2d 160, 140 N.E.2d 252 (1957)), or to corroborate (United States v. Walker, 320 F.2d 472 (6th Cir.1963)), or to impeach (People v. Hughes, 203 Cal.App.2d 598, 21 Cal.Rptr. 668 (1962)), a witness' testimony or to refresh his recollection (Monroe v. United States, 234 F.2d 49 (D.C. Cir.1956), certiorari denied, 355 U.S. 875, 78 S.Ct. 114, 2 L.Ed.2d 79 (1957)).
 S. Rep. No. 1097, 90th Cong., 2d Sess., reprinted in 1968 U.S.C.C.A.N. 2112, 2188.