Steven K. **BERRY**, Appellant

v.

Sherman M. **FUNK**, et al., Appellees

No. 97–5257.

United States Court of Appeals,
District of Columbia Circuit.

Argued April 20, 1998.

Decided July 14, 1998.

Theodore B. Olson argued the cause and filed the briefs for appellant. Michelle L. Bodley entered an appearance.

R. Craig Lawrence, Assistant United States Attorney, argued the cause for appellees, with whom Wilma A. Lewis, United States Attorney, was on the brief. John D. Bates, Assistant United States Attorney, entered an appearance.

Before: SILBERMAN, WILLIAMS, and TATEL, Circuit Judges.

SILBERMAN, Circuit Judge:

Steven K. Berry, former Acting Assistant Secretary of State for Legislative Affairs, complained that various present and former State Department officials and employees monitored his telephone conversations with Elizabeth Tamposi, former Assistant Secretary of State for Consular Affairs, and used and disclosed the contents of these calls in violation of the federal wiretap statute and the Fourth Amendment. The district court granted summary judgment for the defendants. We vacate and remand for further proceedings.

## I.

The facts before us are drawn from appellant's complaint as well as a government document attached as an exhibit to the complaint entitled *Special Inquiry Into the Search and Retrieval of William Clinton's Passport Files,* and which under FED. R. CIV. P. 10(c) is considered a part thereof for all purposes (the government does not dispute the contents of the latter document). This case arises out of events that caused considerable controversy in the heat of the 1992 presidential campaign. It will be recalled that President Clinton's involvement with the draft during the Vietnam War was a matter of widespread attention and great confusion. Rumors floated that, while abroad, he had sought to renounce his citizenship in order to avoid military service. Although Clinton's passport records provided no substantiation for this accusation, State Department personnel reviewing these documents became concerned that Clinton's file may have been tampered with in order to eliminate embarrassing materials. (The matter was referred to the FBI, which, after a brief investigation, found no evidence of tampering.)

Appellant was involved in the "Clinton passport probe" as a result of interest expressed by Republican congressmen. He was, at the time, the Acting Assistant Secretary of State for Legislative Affairs. Performing what he viewed as his liaison responsibilities, Berry assisted Congressman

Gerald Solomon in drafting a letter to the Department in which Solomon would inquire whether Clinton had ever asked about or sought dual citizenship. Berry then called Assistant Secretary of State for Consular Affairs Elizabeth Tamposi and asked her what files the Department kept or retained concerning citizenship records which would contain information about Clinton.

Two days later (and one day after Solomon's letter arrived), on September 30, 1992, Tamposi placed a telephone call to Berry through the State Department Operations Center to let him know that she had Clinton's file in her possession.[1] The Operations Center (also known as "the Watch") is a round-the-clock communications center that performs a variety of functions, such as generating briefings on world events and serving as the focal point for handling urgent crises. The Watch also provides a communications support function. High-ranking Department officials can call the Center, and Watch Officers will connect them to other government officials. The Watch's telephone console provides its Officers with the capacity to monitor all telephone calls placed through the Operations Center. This capability is to be used to serve several interests of the State Department; it enables Watch Officers to monitor crisis situations, author memorandums of conversations between officials for State Department records, and patch others into conversations as needed.

During their September 30 conversation, Tamposi told Berry that Clinton's passport file may have been tampered with and described to him the condition of some of the documents. Three days later, on October 3, 1992, Berry placed another call to Tamposi through the Watch to discuss a second letter he was about to receive from Solomon. Tamposi told Berry that the State Department's Inspector General and the FBI were investigating the possibility that someone tampered with Clinton's file. Later that day, Berry spoke with Janet Mullins, Assistant to the President for Political Affairs. Mullins told Berry that Tamposi had attempted to contact

---

1. Tamposi obtained the file through conducting a search pursuant to FOIA requests that had been submitted by the media and designated by personnel in the State Department's FOIA office for expedited processing.

Margaret Tutwiler, Assistant to the President for Communications, to discuss the Clinton passport file matter. She told him to relay to Tamposi that it was inappropriate for the White House to become involved in the issue and that her calls would not be returned. The next evening, October 4, 1992, Tamposi called Berry through the Watch, and Berry passed Mullins' message to Tamposi.[2]

Berry alleges that his three telephone conversations with Tamposi which took place between September 30 and October 4 were intentionally monitored by Watch Officers in the Operations Center. The Operations Center Manual in effect at the time of these conversations cautioned that calls between Senior Department Officials (other than the Secretary and Deputy Secretary) "should not be monitored unless they so request." He further complains that one of the Watch Officers during the October 4 call pressed a button that caused the call to go "live," resulting in the broadcast of the conversation throughout the entire Operations Center. Berry insists that he had no knowledge that his calls were being monitored and that neither he nor Tamposi had ever consented to monitoring.

On October 15, Acting Secretary of State Lawrence Eagleburger learned that the Operations Center apparently had overheard conversations between Berry and Tamposi and was concerned that the contents of these conversations contained evidence of misconduct by Berry and/or Tamposi. Eagleburger asked the Acting Inspector General Roscoe Suddarth—the Inspector General Sherman Funk was on an overseas trip—to speak with the Watch Officers who had overheard the calls to determine if there was sufficient evidence to begin a more formal inquiry.[3] Suddarth immediately convened a meeting with

John Duncan, Counsel to the Inspector General, Glyn Davies, Director of the Operations Center, and Robert Pearson, Director of the Executive Secretariat. Participants in this session were informed that the monitoring of the Berry/Tamposi telephone calls may have violated both Operations Center procedure and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2521 (1994 & Supp. II 1996).

After interviewing Watch Officers who had overheard the Berry/Tamposi conversations, Suddarth recommended to Eagleburger that the Inspector General's Office (the Office) be authorized to open a formal administrative investigation into possible misconduct by State Department employees in the search for the Clinton passport files. Eagleburger so directed. (This, at least, is the version of events recounted in Eagleburger's affidavit. Berry's complaint and the Office's report both claim that the *Office* decided to open a formal investigation and merely notified Eagleburger of its decision.) The Operations Center immediately issued new guidelines for monitoring calls, which provided that "we must ask permission of the party initiating the call ... to remain on the line," but the Acting Inspector General postponed investigation of the Operations Center's monitoring until the Clinton passport file inquiry was complete. The Office's procedure was inconsistent with its normal practice of investigating alleged criminal conduct before investigating supposed administrative misconduct.

When the Office consulted the FBI for its assistance in the misconduct inquiry, the Bureau learned of the possibly illegal monitoring by Watch Officers and thereupon notified the Office that a criminal investigation by the Department of Justice would soon commence. Duncan, Counsel to the Inspector

---

**2.** During one of their conversations, although it is not clear which, Tamposi asked Berry whether he knew of any political appointees that might assist in searching Clinton's records in London. Berry provided only the name of the Ambassador to the United Kingdom but commented it would be inappropriate to burden him with that task.

**3.** We take notice that, the day before (October 14), Michael Isikoff had a front-page story in *The Washington Post* "rais[ing] questions" as to whether Tamposi's communications to the Lon-

don Embassy concerning Clinton's passport files reflected deviations from standard procedures in the handling of passport records. Michael Isikoff & Eugene Robinson, *U.S. Sought Clinton Files at Embassy*, WASH. POST, Oct. 14, 1992, at A1. And three days before that, Anna Quindlen in *The New York Times* implied the Bush State Department had engaged in "dirty tricks." Anna Quindlen, *Rumor Has It*, N.Y. TIMES, Oct. 11, 1992, § 4, at 17.

General, protested that such an investigation would harm the Office's inquiry into the Clinton passport matter. Representatives from the FBI, the Office, and the Criminal Division of the Justice Department met to resolve the dispute. Michael Shepard, Chief of the Public Integrity Section of the Criminal Division, expressed concern that if the monitoring of the Berry/Tamposi calls were illegal, it would impair the ability of the Justice Department to prosecute should criminal wrongdoing be uncovered in the Clinton passport inquiry. He advised the Office to assemble a group of investigators "untainted" by knowledge of the monitored conversations' contents to take over the Clinton investigation.

Inspector General Funk thereupon returned to Washington where he was scheduled to brief Eagleburger about the investigation the next morning. Because Funk was supposedly "untainted" and Eagleburger also wished to remain "untainted,"[4] Funk was not told the contents of the Berry/Tamposi calls until after his meeting with the Acting Secretary. Soon after this session, the FBI began its investigation into the Watch's monitoring activities, and Funk turned over the investigation of the Clinton passport files inquiry to an "untainted" team of investigators led by Terrence Shea, Assistant Inspector General for Security Oversight. The Office claims that information from the "tainted" investigators was screened and only "untainted" information was turned over to the new team. As Funk and Suddarth were "tainted," they recused themselves from any further participation in investigative determinations, report drafting, and referrals for potential administrative or criminal misconduct.

On November 18, 1992, the Office publicly released a report entitled, *Special Inquiry Into the Search and Retrieval of William Clinton's Passport Files*. The Justice Department had yet to make a determination regarding the legality of Operations Center monitoring practices so the report was the product of only the "untainted" team's work.

The report concluded that Berry provided assistance for activities that he knew were designed to undermine the Clinton campaign and that these actions "were inappropriate and probably a violation of the Hatch Act." The Office recommended that "appropriate disciplinary action" be taken against Berry. At a press conference held in conjunction with the release of the report, Funk stated generally that State Department personnel whose conduct had been investigated had "attempt[ed] to use the Department of State, the records, and the people of the Department of State to influence the outcome of a presidential election."

After receiving a copy of the Inspector General's report, Genta Hawkins Holmes, Director of the Foreign Service, requested that Eagleburger relieve Berry of his duties. Eagleburger did so, but Berry remained with State Department in another position at the same salary for the remainder of the Bush Administration. The report subsequently formed the basis for the Attorney General's application for, and court approval of, the appointment of an Independent Counsel to investigate possible criminal activity relating to the search of Clinton's passport records. After a three-year investigation, the Independent Counsel, in a letter to Berry's counsel, concluded, "[W]e have discovered no evidence that Berry committed any crime related to the matters which resulted in the Appointment of an Independent Counsel. Indeed, we have concluded that he acted within the scope of his authority and responsibilities at the time of the incident and did not violate any law, government regulation or ethics standard."

The Justice Department never brought criminal charges related to the monitoring of telephone conversations by Operations Center staff. Berry, however, filed a civil suit alleging that the interception, disclosure, and use of the contents of his telephone conversations with Tamposi violated Title III and constituted an unlawful search and seizure under the Fourth Amendment. 18 U.S.C. § 2511(1) (1994) prohibits any person from:

---

4. Eagleburger's wish to remain untainted puzzles us as he presumably had already been tainted on October 15, the date he heard rumors about the

contents of the calls and ordered the preliminary investigation.

(a) intentionally intercept[ing], endeavor[ing] to intercept, or procur[ing] any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

. . . .

(c) intentionally disclos[ing], or endeavor[ing] to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally us[ing], or endeavor[ing] to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through interception of a wire, oral, or electronic communication in violation of this subsection.

Berry raised the following allegations: that Watch Officers (John Does 1 through 33) intercepted his conversations with Tamposi in violation of § 2511(1)(a) and unlawfully used and disclosed the contents of these conversations in making notes and disclosing the contents of these conversations to the Office of the Inspector General in violation of § 2511(1)(c) & (d); that Director Davies and Deputy Director Stephen Mull of the Operations Center procured the interception of his telephone conversations in violation of § 2511(1)(a) and used and disclosed the contents of these conversations in violation of § 2511(1)(c) & (d); that Funk, Duncan, Shea, Suddarth, Robert S. Terejesen, an Assistant Inspector General, and other unnamed members of the Office of the Inspector General's investigative team (John Does 34 through 66) conducted an investigation initiated on the basis of information obtained from unlawfully monitored conversations in violation of § 2511(1)(d) and disclosed the contents of these conversations to numerous persons during the course of their investigation in violation of § 2511(1)(c);[5] that Director General Holmes used and disclosed information obtained from the illegally monitored conversations in her memorandum recommending that Berry be relieved of his duties in violation of § 2511(1)(c) & (d); that unnamed State Department employees (John Does 66 through 100) procured the interception of his telephone conversations in violation of § 2511(1)(a) and used and disclosed the contents of these conversations in initiating the Office of the Inspector General's investigation in violation of § 2511(1)(c) & (d); and that the aforementioned conduct constituted an unlawful search and seizure in violation of the Fourth Amendment.[6]

Berry asked for actual damages, which he computed as $3,000,000, or statutory damages, whichever was shown to be greater. See 18 U.S.C. § 2520(c)(2) (1994). The government representing all defendants moved to dismiss Berry's complaint or, in the alternative, for summary judgment, arguing that Berry's statutory claims were time barred, that the interception, use, and disclosure of these calls fell into one or more statutory exceptions, that defendants were entitled to qualified immunity from both Berry's statutory and constitutional claims, and that the use or disclosure of illegally intercepted communications did not constitute a Fourth Amendment violation. The district court granted defendants' motion for summary judgment in its entirety without explanation.

## II.

We look to the government's arguments first because it was the moving party on the summary judgment motion. And it is axiomatic that we review the grant de novo (whether or not the district court expresses its reasons). The government claims that Berry's statutory claims are time barred. A civil action under the wiretap statute "may not be commenced later than two years after the date upon which the claimant first has a reasonable opportunity to discover the viola-

---

**5.** Berry claims, in particular, that Inspector General Funk's "damaging" and "unsupported" statements at the November 18 press conference constituted a prohibited "use" of illegally intercepted information under the statute.

**6.** The government draws our attention to the fact that former Secretary Eagleburger is not a defendant in this case, but a plaintiff, of course, is not obliged to sue everyone against whom he may have a claim.

tion," 18 U.S.C. § 2520(e) (1994), and Berry filed his complaint on October 6, 1994, more than two years after the conversations at issue. It is argued that Berry was obliged to assert *in his complaint* that he discovered the monitoring took place within two years of his filing suit. But that is patently incorrect; the statute of limitations is an affirmative defense and once the government put it in play Berry submitted a sworn affidavit that he did not discover—and had no reasonable opportunity to discover—that his calls had been intercepted until after October 6, 1992. The government has not rebutted that affidavit, but it alternatively claims that Berry must have realized—presumably as a matter of law—that he had been monitored once one of his calls was broadcast throughout the Operations Center on October 4. Yet Berry was not in the Watch Center, and the government has not explained how or why Berry would have known that his call was broadcast. To conclude on this record that the government has met its burden of showing Berry was contemporaneously on notice of the monitoring is out of the question. Indeed, the government's claim is so conclusory it is doubtful that it has even raised a genuine issue as to a material fact—let alone established that the factual issue was conclusively resolved in its favor under Rule 56.

We turn to the meat of the government's case, which is its claim that the various defendants' activities fell within the statutory exceptions (defenses) to the wiretap statute.

### A. The Business Extension Exception

■ For a communication to be "intercepted" under the terms of the statute, its contents must be acquired "through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4) (1994). An "electronic, mechanical, or other device," in turn, is defined as "any device or apparatus which can be used to intercept a wire . . . communication *other than*—

(a) any telephone . . . instrument, equipment or facility, or any component thereof, (i) furnished to the subscriber or user by a provider of wire . . . communication service in the ordinary course of its business and

being used by the subscriber or user in the *ordinary course of its business . . . ."*

18 U.S.C. § 2510(5)(a) (1994) (emphasis added). The government argues no calls were "intercepted" within the meaning of the statute because both requirements of the business extension exemption were satisfied. The Operations Center telephone console which contains the monitoring capability was indisputably furnished by AT&T, a provider of wire service acting in the ordinary course of business, and was used by Watch Officers in the ordinary course of their business when they patched Berry's calls to and from Tamposi. The government, in other words, contends that merely because the intercepted call was a business call, monitoring it was *ipso facto* in the ordinary course of business.

Berry disputes that interpretation, which would allow a business to monitor any particular call whether or not it was its *ordinary* business practice and whether or not employees were on notice that their calls would be monitored. He argues, to the contrary, that employees always must be on actual notice, which would be impossible to establish here because the monitoring took place contrary to the Operation Center's guidelines, which, as we have noted, provided that calls should not be monitored unless so requested.

The Eleventh Circuit in *Epps v. St. Mary's Hospital,* 802 F.2d 412 (11th Cir.1986), on which the government relies, did seem to accept the general principle that any call whose subject is business, if monitored, is necessarily done in the ordinary course of business even if not authorized by a company monitoring policy and not known to employees. *Id.* at 416–17. We think that is too limited an interpretation of "ordinary course of business." We are inclined to agree with the Fourth Circuit that if covert monitoring is to take place it must itself "be justified by a valid business purpose," *Sanders v. Robert Bosch Corp.,* 38 F.3d 736, 741 (4th Cir.1994), or, perhaps, at least must be shown to be undertaken normally. Here, there was no reason presented as to the need for secret monitoring nor was it shown to be routine. Putting aside whether, and under what circumstances, notice to employees is required, in this case the government's position is fa-

tally undermined by the Operation Center guidelines which clearly indicate the norm of behavior the Watch Officers were to follow and which must be regarded as the ordinary course of business for the Center. We think very little of the government's contention that the phrase "should not" in the guidelines rather than "shall not" suggests that the Officers were free to disregard the guidelines and therefore normality is defined by that freedom.

### B. The Switchboard Operator and Provider Exception

■ 18 U.S.C. § 2511(2)(a)(i) (1994) provides:

It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire ... communication service, whose facilities are used in the transmission of a wire ... communication, to intercept, disclose, or use that communication *in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.*

(Emphasis added). The government claims this exception covers the actions of the Watch Officer defendants who actually overheard Berry's conversations and that if their interception and use was legal, it then follows that the subsequent use and disclosure by others would not be illegal. Berry responds that the exception does not apply, because, again, it cannot possibly be deemed in the normal course of a Watch Officer's employment to engage in any monitoring contrary to the guidelines. As we have indicated in the discussion above, we agree with this proposition, but do not think the exception applies here regardless of the Watch Officers' normal practices. A switchboard operator is authorized to overhear (and disclose and use) only that part of a conversation "which is a necessary incident to the rendition of his service." We think it rather obvious from the statutory language that Congress recognized switchboard operators, when connecting calls, inevitably would overhear a small part of a call, but the exception permitting them to use that content is limited only to that moment or so during which the operator must listen to be sure the call is placed. (It has been held that the operator also may stay on the line on those rare occasions when he hears something troubling during that moment, such as the planning of a murder.) *See, e.g., Adams v. Sumner,* 39 F.3d 933 (9th Cir.1994); *United States v. Axselle,* 604 F.2d 1330 (10th Cir.1979); *United States v. Savage,* 564 F.2d 728 (5th Cir. 1977). In short, the switchboard operator, performing only the switchboard function, is never authorized simply to monitor calls.

The government, pointing to the last part of the clause—"except that a *provider* of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks" (emphasis added)—asserts that the negative implication of that wording indicates that non-providers can monitor at will, presumably to their hearts' content. We think that construction is quite strained and unpersuasive. The clause actually recognizes two exceptions, one for switchboard operators of all kinds [7] and the second for employees of public providers of wire communications service, like inter-exchange or local carriers. The provider's employees might be obliged to monitor calls considerably beyond the incidental overhearing by a switchboard operator. The part which pertains to the provider then is obviously designed to insure the carrier engages in service observing or random monitoring only to check for quality control. But there is not even a suggestion in the clause that a switchboard operator acting as a switchboard operator can ever engage in *any* random monitoring—let alone for other than quality control.

### C. Prior Consent Exception

■ The statute authorizes the interception of wire communications "where ... one

---

7. Berry's brief claimed that the switchboard operator portion of the exception was itself limited to a service provider, but Berry prudently abandoned that position at oral argument.

of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c) & (d) (1994). And it has been uniformly held that implicit consent will satisfy. *See Griggs–Ryan v. Smith,* 904 F.2d 112, 116–18 (1st Cir.1990); *United States v. Willoughby,* 860 F.2d 15, 19 (2d Cir.1988). Berry claimed that neither he nor Tamposi ever consented to the monitoring of their calls. The government argues, however, that they did know (or should have known) that Watch Officers, as part of their duties, listened to conversations. They particularly fault Berry for not alleging that the operators told him they were dropping off the line after the calls were placed. The government's argument presumably is that as a matter of law any reasonable person would assume that an operator stayed on the line if not told otherwise. We think that proposition is absurd.

■ Implied consent, to be sure, "is inferred 'from surrounding circumstances indicating that the [party] knowingly agreed to the surveillance.'" *Griggs–Ryan,* 904 F.2d at 117 (quoting *United States v. Amen,* 831 F.2d 373, 378 (2d Cir.1987)). The key question in such an inquiry obviously is whether parties were given sufficient notice. *Compare Griggs–Ryan,* 904 F.2d at 118 (implied consent where prison inmate was expressly informed that incoming calls were being monitored), *with Campiti v. Walonis,* 611 F.2d 387, 393 (1st Cir.1979) (no implied consent where regulations did not inform inmates of monitoring). Without actual notice, consent can only be implied when "[t]he surrounding circumstances [ ] *convincingly* show that the party knew about and consented to the interception." *United States v. Lanoue,* 71 F.3d 966, 981 (1st Cir.1995) (emphasis added).

The government may be able to establish that Berry was aware that the Operations Center had the *capacity* to monitor calls. But appellees have introduced no evidence that either he or Tamposi was told that these specific conversations would be monitored. Nor do we think that the circumstances surrounding these conversations remotely suggest that Berry or Tamposi knew about the interceptions. (Recall that the Operation

Center's guidelines explicitly directed Watch Officers not to monitor unless the parties to the conversation so requested.) We certainly cannot conclude that an operator's failure to inform a party that he is getting off the line normally raises a suspicion in a reasonable person's mind that his call is being monitored. The question of implied consent thus raises a genuine issue of material fact that is not appropriately decided on summary judgment. *See In re State Police Litig.,* 888 F.Supp. 1235, 1265 (D.Conn.1995).

*D. Law Enforcement Exception*

This defense the government asserts for the benefit of the defendants in the Office of Inspector General—not those in the Operations Center. It is argued that as law enforcement officers the former were entitled to use and disclose the contents of Berry's conversations even had they been intercepted illegally because they neither participated in nor sponsored the interception. 18 U.S.C. § 2517 (1994) in part provides:

> (1) Any investigative or law enforcement officer who, by *any means authorized by this chapter,* has obtained knowledge of the contents of any wire, oral, or electronic communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

> (2) Any investigative or law enforcement officer who, by *any means authorized by this chapter,* has obtained knowledge of the contents of any wire, oral, or electronic communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

(Emphasis added.)

■ As might be expected, Berry disputes that State Department employees working in the Office of Inspector General are "investigative or law enforcement officers" within the statute's meaning. The statute defines such officers as those "empowered by law to conduct investigations of *or* to make arrests for offenses enumerated in this chapter," 18

U.S.C. § 2510(7) (1994) (emphasis added), such as bribery, murder, and robbery. *See* 18 U.S.C. § 2516(1) (1994). Admittedly, these are not the normal targets of Inspector General investigations. But the Foreign Service Act authorizes the Office to investigate complaints "concerning the possible existence of an activity constituting a violation of the *laws* or regulations." 22 U.S.C. § 3929(f)(1) (emphasis added). That language sweeps so broadly as to compel us to conclude that the Inspector General defendants are investigative officers within the meaning of the Act.

 The more difficult question, on which there is an apparent circuit split, is whether it can be said that these defendants, who clearly used the intercepted conversations, obtained knowledge of the contents "by any means authorized by this chapter." The only explicitly authorized means under the statute are judicially approved wiretaps, *see* 18 U.S.C. § 2518 (1994), and the scattered statutory exceptions throughout Title III. Yet, as Berry concedes, and as the Ninth Circuit has recognized, *see Chandler v. United States Army*, 125 F.3d 1296, 1300 (9th Cir. 1997), if an investigative or law enforcement officer is given the contents of an interception under the impression that the interception was legally obtained, then use or disclosure, too, would be authorized by the statute. That is so because the prohibition on use or disclosure only applies to those "knowing or having reason to know that the information was obtained through the interception of a . . . communication in violation of this subsection." 18 U.S.C. § 2511(1)(c) & (d). In this case, however, it is undisputed that the Inspector General's office knew of the circumstances under which Berry's conversations were intercepted and its employees were well aware—they had been warned by counsel and the FBI—that the interceptions might be illegal.

The government nevertheless maintains that there is no limitation on a law enforcement officer's use or disclosure of illegally intercepted information so long as he was not involved in or did not procure the interception. It refers to such an officer as having "clean hands." Although the text of § 2517(1) & (2) does not appear hospitable to the government's construction, it relies on a Fifth Circuit case, *Forsyth v. Barr*, 19 F.3d 1527 (5th Cir.1994), in which the court perceived a distinction between the sections' wording and that of a companion provision, 18 U.S.C. § 2517(3) (1994), which uses the phrase "*intercepted* in accordance with the provisions of this chapter*" (emphasis added), rather than "means authorized by this chapter." Section 2517(3) bars recipients of illegally intercepted information from testifying as to that information. The government argues, and the Fifth Circuit agreed, that Congress in § 2517(3) indicated that it knew how to explicitly bar information on the ground that it was illegally *intercepted* without regard to any other consideration. Therefore, in § 2517(1) & (2), Congress must have meant "means authorized by this chapter" to be, in some sense, less restrictive. Although the government never indicates what "means authorized by this chapter" affirmatively signifies, it contends, that whatever it means, it does not ban the use of information known to be illegally intercepted in a case like ours. We disagree. The Fifth Circuit in *Forsyth* relied on a portion of Title III's legislative history, the Senate Report which said:

> Neither paragraphs (1) nor (2) [of § 2517] are limited to evidence intercepted in accordance with the provisions of the proposed chapter, since in certain limited situations disclosure and use of illegally intercepted communications would be appropriate to the proper performance of the officers' duties. For example, such use and disclosure would be necessary in the investigation and prosecution of an illegal wiretapper himself.

*Id.* at 1544 (emphasis removed) (quoting S. Rep. No. 90–1097, *reprinted in* 1968 U.S.C.C.A.N. 2112, 2188). It appears to us, however, that in that passage the authors of the Report understandably contemplated that if an illegal interception were prosecuted, it would be necessary for officers to "use" the contents of that interception but still did not wish the officers to testify about it because the testimony would further injure the privacy of the speaker. *See also Chandler*, 125 F.3d at 1302 ("[T]he illegal interceptor

has no standing to invoke the act as a shield for his own violation."). We simply do not understand the Fifth Circuit's use of that special example in the legislative history to justify a broader knowing use of illegally intercepted conversations *against* one of the speakers.[8]

Nor are we persuaded by the reasoning of the Sixth Circuit in *United States v. Murdock*, 63 F.3d 1391 (6th Cir.1995). The court seems to have relied only on policy notions rather than the language of the statute in accepting the government's "clean hands" argument. (To assume that an officer who knowingly uses illegally intercepted conversations has clean hands is to assume the conclusion.) Instead, we agree with the Ninth Circuit's decision in *Chandler*. There, the court held that Army investigators were not shielded by the law enforcement exception when they used a tape they had reason to know was illegally intercepted. *Chandler*, 125 F.3d at 1302. The Ninth Circuit, as do we, rejected *Murdock* because its interpretation did not square with the statute's language.

### E. Qualified Immunity

 The government contends that even if none of the statutory exceptions are available to any of the defendants, the district court's order can be affirmed because all defendants are entitled to qualified immunity. In the context of constitutional torts, qualified immunity means that a government official sued personally is not liable unless his conduct violates "clearly established ... rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The government would have us apply that doctrine to the statutory claims as well as Berry's constitutional claims. We have never held, however, that qualified immunity applies broadly to Title III claims and we do not see why it would. Qualified immunity is typically invoked in two types of cases: *Bivens*[9] actions—constitutional

torts—brought against federal officials and claims brought against state officers under 42 U.S.C. § 1983 (1994). But these causes of action were largely "devised by the Supreme Court without any legislative or constitutional (in the sense of positive law) guidance."*Crawford–El v. Britton*, 93 F.3d 813, 832 (en banc) (Silberman, J., concurring) (D.C.Cir.1996). It is understandable, then, that the Court also developed the doctrine of qualified immunity to reduce the burden on public officials. We agree with Berry, however, that the qualified immunity doctrine applied to constitutional torts and § 1983 actions has no application to his statutory claims. That is so because Title III itself provides a complete defense for "[a] good faith reliance on ... a court warrant or order, a grand jury subpoena, a legislative authorization, or a statutory authorization." 18 U.S.C. § 2520(d) (1994). (The government has not asserted this defense for appellees.) When Congress itself provides for a defense to its own cause of action, it is hardly open to the federal court to graft common law defenses on top of those Congress creates. *See City of Milwaukee v. Illinois*, 451 U.S. 304, 314, 101 S.Ct. 1784, 68 L.Ed.2d 114 (1981) ("[W]hen Congress addresses a question previously governed by a decision rested on federal common law the need for such an unusual exercise of lawmaking by federal courts disappears."). This is particularly so when Congress provides for a good faith defense that is more limited than the qualified immunity good faith doctrine the judiciary has devised; Congress, it might be said, has "occupied the field."

As the government reminds us, we have before recognized qualified immunity against *both* Fourth Amendment and Title III claims. *See Halperin v. Kissinger*, 606 F.2d 1192 (D.C.Cir.1979); *Zweibon v. Mitchell*, 516 F.2d 594 (D.C.Cir.1975). But those cases involved a statutory exception, since repealed, that nothing in Title III "shall limit the constitutional power of the President ...

---

**8.** The Fifth Circuit's discussion might be thought *dicta* because the police in that case were unaware of the illegal nature of the monitoring when they received the tapes, and for much of their investigation.

**9.** *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

to protect national security information against foreign intelligence activities." 18 U.S.C. § 2511(3) (1970). Because "Congress made the applicability of Title III turn on the future course of constitutional law," *Zweibon,* 516 F.2d at 671, we held that in cases where defendants raised this exception the doctrine of qualified immunity applied to plaintiff's statutory claims in the same manner as it applied to plaintiff's constitutional claims. *See Halperin,* 606 F.2d at 1209 n. 115 (D.C.Cir.1979). Berry's statutory claims here, however, do not similarly turn on a constitutional question.

In sum, we conclude that appellees were not entitled to summary judgment with respect to Berry's statutory claims. Certain of Berry's claims do seem weak at this stage. For example, we have trouble understanding how Director General Holmes' consideration and recitation of publicly released information in recommending that Berry be relieved of his duties could be considered a prohibited use or disclosure under Title III. And we rather doubt that those, such as Shea, who apparently were solely involved with the "untainted" portion of the investigation can be held liable. Nevertheless, without further factual development, we cannot say at this stage that any of Berry's specific statutory claims are without merit.

### F. Bivens Claims

Berry asserts that the use of an electronic device to capture a telephone conversation constitutes a "search and seizure" within the meaning of the Fourth Amendment. *See Katz v. United States,* 389 U.S. 347, 353, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Whether the interception constitutes a constitutional violation, in turn, "depends on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy." *Smith v. Maryland,* 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979) (internal quotations and citations omitted). Assuming Berry's allegations to be true, the monitoring of his phone conversations with Tamposi may well have been a violation of his Fourth Amendment rights. The combination of a lack of notice that his calls were being monitored

with the Operation Center's guideline, which explicitly warned against listening to the calls at issue, could well have created a "legitimate expectation of privacy" on Berry's part. *See In re State Police Litig.,* 888 F.Supp. at 1256 (recognizing that "the determination of whether the plaintiffs' expectations of privacy were reasonable depends on proof of the absence of notice.")

The only defendants, however, who allegedly monitored Berry's conversations were the Watch Officers. Berry seeks to hold the other appellees liable for Fourth Amendment violations on different theories, which they vigorously contest. While Operations Center Director Davies and Deputy Director Mull claim that Berry is attempting to impose liability on them under a theory of *responde-at superior,* his complaint actually alleges that they, and others in the Operations Center, *procured* the interceptions in question. Berry also asserts that the appellees from the Office of Inspector General and Director General Holmes violated his Fourth Amendment rights by disclosing and using the contents of the unconstitutionally monitored calls.

Appellees maintain that Berry's allegations do not make out a Fourth Amendment violation, and alternatively, that they are entitled to qualified immunity on these claims as their conduct did not "violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. 2727. We need not at this point, however, resolve the validity of Berry's *Bivens* claims. We rather doubt that appellees' conduct, apart from the procurement and actual interception of the telephone calls, constitutes clearly established Fourth Amendment violations, *see United States v. Calandra,* 414 U.S. 338, 354, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) ("Questions based on illegally obtained evidence are only a derivative use of the product of a past unlawful search and seizure. They work no new Fourth Amendment wrong."). Still, there is no difference between the conduct relevant to Berry's statutory claims and the conduct relevant to his constitutional claims. Although defendants pleading qualified immunity are ordinarily entitled to a decision on both ques-

tions before the commencement of discovery, *see Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), resolving Berry's constitutional claims is unnecessary now because dismissing them would not spare appellees any time or expense.

\*　\*　\*　\*　\*　\*

The district court inappropriately granted summary judgment before allowing Berry to discover evidence in support of the allegations set forth in his complaint. We accordingly vacate the award of summary judgment and remand for further proceedings.