Vickey Horton TAPLEY, Plaintiff,

v.

Darrell COLLINS, William Torrance,
Ronnie Dixon, and the City of
Vidalia, Georgia Defendants.

No. CV 698–38.

United States District Court,
S.D. Georgia,
Statesboro Division.

March 26, 1999.

Robert P. Killian, Killian & Boyd, PC, Brunswick, GA, for Vickey Horton Tapley, plaintiffs.

Mary Mendel Katz, Chambless, Higdon & Carson, LLP, Thomas F. Richardson, Chambless, Higdon & Carson, Macon, GA, for Darrell Collins, William Torrance, Ronnie Dixon, The City of Vidalia, Georgia, defendants.

## ORDER

EDENFIELD, District Judge.

## I. INTRODUCTION

In this highly contentious case, *see* doc. #50; #57, exh. A–D, plaintiff Vickey Horton Tapley alleges that Vidalia, Georgia police chief Darrell Collins used an open air scanner to eavesdrop on three of her cordless telephone conversations. Doc. #1 ¶¶ 9–15; #33 ¶7. A Georgia Bureau of Investigation (GBI) agent, Tapley further alleges that Collins subsequently disclosed summaries of her conversations to others so he could interfere with her employment and inflict emotional distress. Doc. #1 ¶¶ 16–18; #33 ¶7.

There is no dispute that Collins disclosed the substance of the conversations to Vidalia's city manager, William Torrance, and its mayor, Ronnie Dixon. Both

Torrance and Dixon, Tapley asserts, then joined Collins in discussing the conversations with her GBI supervisor. *Id.* The supervisor thereafter excluded Tapley from participating in Vidalia-area GBI investigations. *Id.*

Therefore, Tapley concludes, the chief, manager, mayor and the City of Vidalia violated her (a) telephone privacy rights guaranteed by 18 U.S.C. § 2510 *et seq.;* and (b) civil rights, as redressable under 42 U.S.C. § 1983. Doc. # 1 ¶¶ 19–32, 38–41. Plaintiff also raises an emotional distress claim. *Id.* ¶¶ 23, 37. Finally, she moves for partial summary judgment and to partially quash a subpoena. Doc. ## 14, 22. Defendants oppose those motions and move for complete summary judgment.[1] Doc. # 24.

## II. *BACKGROUND*

Collins, who lives just 200 feet away from Tapley, doc. # 26 ¶ 7, owns an electronic scanner. Collins dep. at 5–6. One evening in November, 1997, the scanner—randomly set to no particular channel—intercepted a cordless telephone conversation between Tapley and Glen Meeks, a retired GBI agent and Tapley's mentor. Collins dep. at 5–8; Tapley dep., exh. 3 at 2.

Collins recognized both Tapley's and Meeks's voices and continued listening because "[Tapley] was talking about me . . . ." Collins dep. at 9, 11. He then "pressed a 'hold button' to prevent the [scanner] from scanning off that frequency," doc. # 28 ¶ 3, and later that evening captured two more Tapley telephone conversations about him.

Collins dep. at 9–10. He took notes on all three calls, then typed them up on his computer. *Id.* at 12.

Collins's ears were especially attuned to Tapley's words because prior to that night he learned from Bobby Young, one of his police officers, that Tapley had approached Young's wife about a sting operation targeting Torrance. Collins dep. at 28, 30–31; Torrance dep. at 33; doc. # 45 at 2. Concluding that Tapley's efforts were not bona fide, Collins informed Torrance about them. Collins dep. at 31–32; *see also id.* at 34 ("I just told [Torrance] that Bobby had information that [Tapley] was trying [to] solicit someone that would try to do sex for drugs and try to target him"); *see also* Torrance dep. at 27–28, 32.[2]

After listening to Tapley's conversations, Collins called Torrance later that evening and disclosed to him the substance of what he intercepted. Torrance dep. at 10. He did so again the next morning in Torrance's office, where he brought his notes of the calls. *Id.* at 11–12. Torrance, in turn, called Greg L. Owen, Tapley's GBI supervisor, and disclosed to him the substance of the intercepted conversations. *Id.* at 15–16; Tapley dep., exh. 2 at 2. Owen replied that he would travel to Vidalia that day to meet with him. Torrance dep. at 13–14; *see also* Collins dep. at 34–36.

Torrance then informed Mayor Dixon about the upcoming meeting, Torrance dep. at 14, though Dixon did not learn of the conversations' contents until after the meeting began. Dixon dep. at 5–6, 8. When Owen met with Collins and Torrance, Dixon joined them. Torrance dep.

1. This Court applies the summary judgment principles explained in *Mize v. Jefferson City Bd. of Educ.,* 93 F.3d 739, 742–43 (11th Cir. 1996) and *Cohen v. United American Bank of Cent. Fla.,* 83 F.3d 1347, 1349 (11th Cir. 1996). In that respect, a non-moving party does not controvert an evidentially supported Fact Statement merely by stating, for example, that a factual assertion is "denied" or "controverted." *See, e.g.,* doc. # 28 ¶ 6.

Rather, the non-movant must **rebut** it with **evidence,** or point to something in the record showing why the movant's assertions are unsupported. *See, e.g., Union Planters Nat.*

*Leasing, Inc. v. Woods,* 687 F.2d 117, 119 (5th Cir.1982) ("Defense of a proper summary judgment motion requires more than a mere denial"). Otherwise, such Fact Statements are deemed admitted under Local Rule 56.1 and *Dunlap v. Transamerica Occidental Life Ins. Co.,* 858 F.2d 629, 632 (11th Cir.1988).

2. Tapley, incidentally, denies that she intended to have someone attempt to offer sex for drugs from Torrance, and insists her investigation was bona fide. Doc. # 35 (sealed summary judgment response brief) at 2–3; Tapley dep. at 140–41 & exh. 3 at 1; doc. # 49 at 2.

at 20. At that time, Torrance expressed his concern over whether the Vidalia police department and the GBI could work harmoniously together. *Id.* at 15.[3]

Owen asked to see Collins's notes of Tapley's telephone conversations. Torrance dep. at 20. Collins complied. Tapley dep., exh. 2 at 4. After the men spoke about the nature of the conversations, Owen responded that he would exclude Tapley from future investigations within the Vidalia region. Collins dep. at 36; *see also* Torrance dep. at 21; Tapley dep., exh. 2 at 4. Owen also wondered if there might be "potential liability" with respect to Collins's telephone interception. Collins dep. at 38; *see also* Tapley dep., exh. 2 at 4.

### III. ANALYSIS

#### A. Telephone Privacy Rights—Georgia Law

Generally, it is illegal for "A" to eavesdrop on a telephone conversation between "B" and "C." 18 U.S.C. § 2510 *et. seq.*; O.C.G.A. § 16–11–62; *see generally* Ann., *Eavesdropping as violating right of privacy*, 11 ALR3d 1296 § 3. In other words, third-party eavesdropping of a telephone conversation, absent statutory authorization, is prohibited.[4]

In that vein, Georgia's telephone privacy statutes arguably provide more privacy protections than their federal counterparts. O.C.G.A. § 16–11–62(4), for example, makes it unlawful for "[a]ny person intentionally and secretly to intercept by the use of *any* device, instrument, or apparatus the contents of a message sent by a telephone, telegraph, letter or by *any other* means of private communication." (Emphasis added); *see also Granese v. State*, 232 Ga. 193, 196, 206 S.E.2d 26 (1974) (Georgia's eavesdropping statute "is supplementary of the Federal statute").

In addition, O.C.G.A. § 16–11–62(6) extends that statute's reach to "[a]ny person [who] commit[s] any other acts of a nature *similar* to those set out in paragraphs (1) through (5) of this Code section which invade the privacy of another." (Emphasis added). Georgia law also expressly extends that prohibition to "cellular radio telephone conversations." O.C.G.A. § 16–11–66.1; *see* Tapley dep. at 78–79.

 Eavesdropping victims can bring civil actions under Georgia's eavesdropping act. *See Awbrey v. Great Atl. & Pac. Tea Co.*, 505 F.Supp. 604, 610 (N.D.Ga.1980) (citing what is now O.C.G.A. § 16–11–64(e)) ("A good faith reliance on a court order or legislative authorization shall constitute a complete defense to any *civil* or criminal action brought under this part or under any other law") (emphasis added).[5]

---

3. Tapley dismisses this as a disingenuous exaggeration raised to evade 18 U.S.C. § 2511 liability. Doc. # 35 (summary judgment response brief) at 7.

4. Compare that to "second-party" wiretapping, where A records and even discloses to others his own conversation with B—all without B's knowledge. *See generally* 74 AM. JUR. 2D *Telecommunications* § 217. That *is* legal under federal law, *see* 18 U.S.C. § 2511(2)(c); *U.S. v. Gotti*, —— F.Supp.2d ——, ——, 1999 WL 151044 at * 26 (S.D.N.Y. 1999); *cf. Pollock v. Pollock*, 154 F.3d 601, 610 (6th Cir.1998) ("vicarious consent"), in Georgia, *see* O.C.G.A. § 16–11–66(a); *Fetty v. State*, 268 Ga. 365, 366, 489 S.E.2d 813 (1997), and elsewhere, *see generally* Ann., 24 ALR4th 1208; 27 ALR4th 449; 74 ALR2d 855, though not everywhere, *see People v. Stone*, —— Mich.App. ——, —— N.W.2d ——, ——, 1999 WL 80430 at * 1 (1999) (excerpting

State statute forbidding "[a]ny person who is present or who is not present during a private conversation" from taping it without the consent of all involved), in which case 18 U.S.C. § 2511(2)(d) renders "A–B" taping illegal. *See Biton v. Menda*, 796 F.Supp. 631, 633 (D.P.R.1992); *see also Otto v. Box U.S.A. Group, Inc.*, 177 F.R.D. 698, 701 (N.D.Ga. 1997) (special ethical and discovery considerations for lawyers).

5. "Because Congress intended to allow the [S]tates to supplement [federal law in this area,] .... [S]tate law will be preempted only if it conflicts with, or if it is more permissive than, the federal law. Thus, the vast majority of [S]tates and the District of Columbia have enacted statutes regulating the interception of oral and wire communications." S.L. Kopecky, *Dealing With Intercepted Communication: Title III of the Omnibus Crime Control and Safe Streets Act In Civil Litigation*, 12

But Tapley's Complaint fails to expressly invoke it. *See* doc. # 1.

Ordinarily, neither would this Court. *See U.S. v. Burkhalter,* 966 F.Supp. 1223, 1225 n. 4 (S.D.Ga.1997) ("[i]t is not the province of this Court to raise issues on behalf of litigants before it"). However, Tapley's Court Interrogatory Response # 2 cites "[S]tate laws concerning invasion of privacy" and "[o]ther statutory and case law with respect to theories of tort and damages." Doc. # 2 at 2. And, "Count 2" of her Complaint expressly presents an "invasion of plaintiff's right to privacy" claim. Doc. # 1 at 6. Read together, these allegations present a claim which reasonably fits under the Georgia eavesdropping statute, thus fulfilling F.R.Civ.P. 8(a)'s requirements.[6]

## B. Telephone Privacy Rights—Federal Law

*Spetalieri v. Kavanaugh,* 36 F.Supp.2d 92 (N.D.N.Y.1998)—a case published after the instant parties finished briefing—bears several parallels to this case. Spetalieri was head of the Kingston, N.Y., police department's narcotics bureau when he engaged in telephone conversations with a friend, Rachel Bloom. *Id.* at 93. Washington, a neighborhood watch program member, used a scanner to monitor police, fire and public works department communications. *Id.* One day her scanner intercepted Spetalieri and Bloom's telephone conversations. *Id.* Spetalieri used a corded telephone, but Bloom used a cordless. *Id.* During their conversations, Spetalieri frequently used profanity and disparaged blacks. *Id.*

Washington recognized Spetalieri's voice and decided "his speech was inappropriate, especially in light of his [official position]." *Id.* So, she "locked her scanner on the

particular frequency that received [Spetalieri's] telephone conversation and tape recorded three telephone conversations...." *Id.* She subsequently handed her tape over to Clarke, a local NAACP branch president, who played it for other NAACP members before delivering it to the local district attorney's (DA's) investigator. *Id.* at 101.

However, Clarke did not advise the investigator of the tape's source. *Id.* She claimed that she found it in her mailbox and that "the recording came from conversations that had been inadvertently heard over someone's television." *Id.* The DA himself listened to a portion of the tape, then directed the investigator to copy and deliver it to the deputy chief of police. *Id.* The DA also recommended that Spetalieri be suspended or put on limited duty pending an internal investigation. Criminal cases in which Spetalieri was involved were then reconfigured to avoid using his testimony. *Id.*

The investigator next informed the police chief of the tape, who advised him to contact the city's mayor. *Id.* The mayor convened a police board, which ultimately recommended that Spetalieri be indefinitely suspended with pay. *Id.* Adverse media coverage followed. *Id.* at 101.

Spetalieri thereafter avoided disciplinary charges through negotiations which resulted in his retirement with financial compensation. *Id.* However, he subsequently brought suit under § 1983 and New York law against all involved in the tape's creation and transmission. *Id.* He later moved to amend his Complaint to add 18 U.S.C. § 2510–based causes of action. *Id.* The court first held that Spetalieri had no § 1983 cause of action against Washington and Clarke because they were private ac-

---

Rev.Litig. 441, 442 (1993) (quotes and footnotes omitted; brackets original and added); *see also* Ann., *Construction and application of state statutes authorizing civil cause of action by person whose wire or oral communication is intercepted, disclosed, or used in violation of statutes,* 33 A.L.R.4th 506.

6. *See Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 964 n. 2 (11th Cir.1997) ("The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim") (internal quotes and cite omitted).

tors and were not shown to have conspired with the State actors in the case (i.e., because none of the State actors were informed of the tape's § 2510–violating origin, none could be said to have acted in concert to harm Spetalieri). *Id.* at 103.

After rejecting Spetalieri's First, Fourth and Fourteenth Amendment claims, *id.* at 103–9, as well as his State-law claims, *id.* at 109–11, the court granted his motion to amend, holding that § 2510 "applies to all cordless telephone conversations...." *Id.* at 111. In reaching that result, the court noted an argument sometimes employed in interpreting Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III), as amended by the Electronic Communications Privacy Act of 1986 and the Communications Assistance for Law Enforcement Act of 1994, 18 U.S.C.A. §§ 2510–22 (West 1970 & Supp.1998): that Congress did not intend to extend Title III to cordless telephones because they are so easily intercepted; hence, no one has a reasonable expectation of privacy while using them.

The 1986 Title III amendment incorporated that view. *Id.* at 113. In fact, it "expressly excluded the radio portion of a cordless telephone communication that is transmitted between the cordless telephone handset and the base unit from the [statute's] definitions of a 'wire communication' and an 'electronic communication.' *See* Pub.L. 99–508, § 101(a)." *Id.* at 113; *see also In re Askin,* 47 F.3d 100, 102–04 (4th Cir.1995).

But Congress amended the statute in 1994 to remove the cordless telephone exception from the wire or electronic communications definitions, *see* P.L. 103–414, § 202(a), "and amended the penalty provisions to include the interception of cordless telephone conversations." P.L. 103–414, § 202(b). *Spetalieri,* 36 F.Supp.2d at 113; *Stone,* 593 N.W.2d at 683 n. 3. This is reflected, the *Spetalieri* court pointed out, in § 2511(4)(b), which provides that:

[i]f the offense is a first offense ... and is not for a tortious or illegal purpose or

for purposes of ... commercial advantage or private commercial gain, and the wire or electronic communication with respect to which the offense under paragraph (a) is a radio communication that is not scrambled, encrypted, or transmitted using modulation techniques ... then ... [ (ii) ] if the communication is the radio portion of ... *a **cordless telephone*** communication that is transmitted between cordless telephone handset and the base unit ... the offender shall be fined under this title.

*Spetalieri,* 36 F.Supp.2d at 113 (emphasis added); *accord Nix v. O'Malley,* 160 F.3d 343, 346 n. 2 (6th Cir.1998) ("cordless telephone calls did not enjoy federal protection when intercepted in early 1994. Title III did not protect cordless telephone communications until Congress amended it by passing the Communications Assistance for Law Enforcement Act on October 24, 1994. *See* 108 Stat. 4279 § 202"); *Quigley v. Rosenthal,* 43 F.Supp.2d 1163, 1183–84 (D.Colo.1999); *see also McKamey v. Roach,* 55 F.3d 1236, 1240–41 (6th Cir. 1995).

## C. Invasion of Privacy—Georgia Tort Law

■ Georgia's common law recognizes an "invasion of privacy" tort claim:

In *Yarbray v. Southern Bell,* 261 Ga. 703, 704, 409 S.E.2d 835 (1991), our Supreme Court pointed out that "[t]he 'unreasonable intrusion' aspect of the invasion of privacy involves a prying or intrusion, which would be offensive or objectionable to a reasonable person, into a person's private concerns." (Citations omitted.) *Id.* at 705, 409 S.E.2d 835. In *Yarbray,* the court recognized that even "highly personal questions or demands by a person in authority may be regarded as an intrusion on psychological solitude or integrity and hence an invasion of privacy." (Citation omitted.) *Id.* at 705, 409 S.E.2d 835.

*Troncalli v. Jones,* 237 Ga.App. 10, 514 S.E.2d 478, 482 (1999).

This is a fairly flexible claim. The *Troncalli* court, for example, upheld it on "stalking" evidence: that a defendant intentionally brushed up against a female plaintiff's breasts; followed her in his car; made a threatening gesture at her; put his mouth on her neck; followed her when she tried to get away; and visited her house and knocked loudly on her door; his actions "were an unreasonable, offensive intrusion into her seclusion and solitude." *Id.* at 481. Yet, the court also reminded litigants that every invasion of privacy claim must contain an "intrusion," which must "be physical, analogous to a trespass." *Troncalli,* 514 S.E.2d at 482 n. 3.

### D. Defendant Collins

#### (1) Federal Wiretap Act

The defendants' defenses exploit the fact that "construction of the Wiretap Act is fraught with trip wires," *Forsyth v. Barr,* 19 F.3d 1527, 1542–43 (5th Cir.1994), thus necessitating some fairly technical discussion best viewed through the following general points. First, "[s]ection 2511(1)(a) and § 2511(1)(b) both prohibit similar conduct: subparagraph (1)(a) establishes a blanket prohibition against the interception of any wire, oral, or electronic communication, while subparagraph (1)(b) prohibits the use of any device to intercept oral communications in particular circumstances." Ann., *Construction and application of 18 U.S.C.A. § 2511(1)(a) and (b), providing criminal penalty for intercepting, endeavoring to intercept, or procuring another to intercept wire, oral, or electronic communication,* 122 ALR Fed 597 § 2(a).

Second, § 2510(4) defines "intercept[ion]" to include "aural" (i.e., heard by the human ear), "or other" (hence, recorded and unrecorded) acquisition of the contents of an "oral communication through the use of *any* electronic, mechanical, other device." (Emphasis added); *see also*

*Abbott v. Village of Winthrop Harbor,* 1998 WL 433772 at * 7 (N.D.Ill.1998) (unpublished) (and there need not be any proof that a defendant actually listened to an intercepted communication).

Third, § 2511(1) covers only *intentional* interceptions. This issue has been the subject of some debate. *See Stone,* 593 N.W.2d at 684 n. 1 (in light of majority's holding that prosecution could proceed against defendant accused of violating State eavesdropping statute by using his scanner and tape recorder to intercept his neighbor's cordless telephone conversations, concurrence/dissent expressed uncertainty over whether the crime commenced "at the moment [defendant] turned his scanner on, the moment a voice came over the system and the system began to record, or at the moment [he] actually listened to the recording"); *see also* Ann., *What constitutes an "interception" of a telephone or similar communication forbidden by the Federal Communications Act [§ 47 U.S.C. § 605] or similar state statutes,* 9 ALR3d 423.

■ Applying these principles, the Court concludes that Collins did not violate § 2511(1) as to Tapley's first telephone call when he randomly intercepted it with his scanner—until he knew what was being intercepted and continued listening to it. *See U.S. v. Townsend,* 987 F.2d 927, 929–30 (2nd Cir.1993) (in prosecution of a sheriff on § 2511(a)(1) telephone eavesdropping charge, district court's charge requiring that the jury find that defendant acted "knowingly," "deliberately," "intentionally" and "understandingly" properly instructed jury as to the required degree of culpability); *Peavy v. Harman,* 37 F.Supp.2d 495, 510 (N.D.Tex.1999) ("the legislative history indicates that this was done 'to underscore that inadvertent interceptions are not crimes.' 1986 U.S.C.C.A.N. at 3577. Subsequent judicial decisions make it clear that 'intentional' under Title III means simply 'not accidental' "); 74 AM. JUR. 2D *Telecommunications* § 209.

Since Collins admits that he knew what his scanner intercepted (indeed, he took notes on it), Tapley is entitled to summary judgment on her §§ 2510/2511(1) claim against him on her first conversation. As for the two additional conversations, Collins does not deny that, like defendant Washington in *Spetalieri,* and the defendants who similarly scanned cordless telephone conversations in *Peavy,* 37 F.Supp.2d at 511, he intentionally set his scanner to intercept them, thus again violating § 2511(1) in each instance. The same result obtains for Tapley's "disclosure" claims. *See Peavy,* 37 F.Supp.2d at 511, 514; *Goodspeed v. Harman,* 39 F.Supp.2d 787, 790 (N.D.Tex.1999) ("even revealing the general nature of a communication or intimating its contents may constitute an actionable disclosure").

Collins cites a law review article for the proposition that §§ 2510/2511 do not protect cordless telephone conversations. Doc. # 27 at 3–5 (citing B.W. Mangano, *The Communications Assistance Act and Protection of Cordless Telephones Communications: The Use of Technology as a Guide to Privacy,* 44 Clev.St.L.Rev. 99 (1996)). The *Spetalieri* court convincingly rejected that analysis because "it is contrary to the plain language of the statute." 1998 WL 901836 at * 14. This Court agrees.

■ Collins next invokes § 2511(2)(g)(i), which provides that "[i]t shall not be unlawful... (i) to intercept an electronic communication made through an electronic communication system that is configured so that such electronic communication is readily accessible to the general public...." This subdivision, especially when read in conjunction with § 2511(2)(g)(ii) and § 2510(16), obviously contemplates the use of scanners to intercept (a) police, fire and emergency radio traffic; along with (b) any other electronic communications the designers and users of which—from decades of experience—have no reasonable grounds to expect anything but casual, even *wide-scale* interception by others (e.g., "CB radios").

In contrast, cordless telephones were never designed with that intent. True, early versions were prone to substantial electronic "leakage," leading courts and Congress alike to conclude that no one could reasonably claim a right to privacy when using them. *See Spetalieri,* 36 F.Supp.2d at 113; *Peavy,* 37 F.Supp.2d at 505–06. But no one has argued that cordless phone manufacturers intended, or were even lax about, any "incidental broadcast" feature. Indeed, those manufacturers have since brought improved (bearing more privacy-ensuring features) models to market. *See* Magloire dep. at 9–10.

Keeping pace with that technological evolution (e.g., digital-based, scrambling technologies were incorporated into cordless telephones), Congress amended § 2511 to expressly include cordless telephones within its protective umbrella. But it did so without also saddling courts with the task of differentiating between the different types of cordless telephones entering the market each year, much less the pre-installed (hence, less sophisticated) user base. This is demonstrated by § 2511(4)(b), which

makes it particularly clear that Congress did not intend to exempt non-scrambling, less sophisticated cordless telephones from the privacy protections. That Congress intended to include *all* cordless telephone conversations becomes particularly clear when one juxtaposes the amended version of § 2511(4)(b) with its predecessor. As originally enacted, § 2511(4)(b) covered only "cellular telephone communication[s]" and made no mention of cordless telephones. *Compare* P.L. 99–508, § 101(d)(2) with 18 U.S.C. § 2511(4)(b)(ii). Further, § 2511(4)(b) reveals that Congress was aware of the distinction in the types of cordless phones available. If Congress intended to include one type of cordless telephone, but not another, it could have expressly done so. Rather, Congress amended the statute to include *all* cord-

less telephones, *regardless* of their sophistication.

*Spetalieri*, 36 F.Supp.2d at 113 (emphasis added).

Other than Collins's technical argument (that only users of "scrambling" telephones have a reasonable expectation that their telephone conversations shall remain private and thus enjoy § 2511's coverage), he does not dispute that Tapley otherwise "had an expectation that her oral communications were not subject to interception" and that it was "justified under the circumstances." *Cross v. State of Ala.*, 49 F.3d 1490, 1508–09 (11th Cir.1995) (both elements, incidentally, may be shown by circumstantial evidence); *see also Walker v. Darby*, 911 F.2d 1573, 1578 (11th Cir. 1990); *U.S. v. Harrison*, 986 F.Supp. 280, 281 (M.D.Pa.1997).[7]

■ Collins also raises an "ignorance of law" argument—that because he did not realize that he was violating § 2511(1) when he intercepted Tapley's conversations over his scanner, he cannot be said to have engaged in an "intentional" interception in violation of § 2511(1). However, the weight of authority precludes this defense. *See Nix*, 160 F.3d at 349 (and the "trier of fact may rely on circumstantial evidence ....."); *Williams v. Poulos*, 11 F.3d 271, 284–85 (1st Cir.1993); *Peavy*, 37 F.Supp.2d at 510 (concluding, in scanner/cordless telephone case, that "[w]hether the [defendants] knew their actions were illegal is irrelevant"); *Gaubert v. Gaubert*, 1999 WL 10384 at * 1 (E.D.La.

1999) (unpublished). Hence, Tapley need only show:

> 1) [that] the information used or disclosed came from an intercepted communication, and 2) sufficient facts concerning the circumstances of the interception such that the defendant[s] could, with *presumed* knowledge of the law, determine that the interception was prohibited in light of Title III .... *Thompson v. Dulaney*, 970 F.2d 744, 749 (10th Cir.1992).

*Nix*, 160 F.3d at 349–50 (emphasis added; brackets original). Collins himself (*see* doc. # 26, Collins aff. ¶¶ 3–8; Collins dep. at 7–14) has shown that he was "aware of the factual circumstances that would violate the statute." *Thompson*, 970 F.2d at 749; *Fields v. Atchison, Topeka, and Santa Fe Ry. Co.*, 985 F.Supp. 1308, 1314 (D.Kan.1997), *modified*, 5 F.Supp.2d 1160 (D.Kan.1998).

■ Finally, the § 2517(1)-(2) "law enforcement" exception, *see* doc. # 27 at 11, does not save Collins here. Simply put, government and thus law enforcement officers cannot invoke § 2517 (which basically authorizes disclosure between law enforcement officials for "proper performance of official duties," *see* § 2517(1)), if they knew or had reason to know that the original interception was obtained in violation of § 2510 *et seq. Spetalieri*, 36 F.Supp.2d at 118.

Government officers therefore must "demonstrate that they did not have the requisite degree of knowledge ...." *Id.*; *see also Chandler v. U.S. Army*, 125 F.3d 1296, 1301 (9th Cir.1997) ("if law enforce-

---

7. In that respect,

> [w]ire communications, unlike oral communications, are protected against interception by electronic, mechanical, and other devices regardless of the speaker's expectation of privacy. *Briggs v. American Air Filter Co.*, 630 F.2d 414, 417 n. 4 (5th Cir.1980) (*comparing* § 2510(1) *with* § 2510(2)); *see also United States v. Harpel*, 493 F.2d 346, 349 (10th Cir.1974) (recognizing lack of requirement to prove reasonable expectation of privacy with regard to intercepted wire communications).

*Kinsey v. Case*, 1998 WL 704687 at * 1 (10th Cir.1998) (unpublished). And, " 'wire communications' " means "any *aural* transfer made in *whole or in part* through the use of facilities for the transmission of communications by the aid of wire, cable or other like connection between the point of origin and the point of reception...." § 2510(1) (emphasis added). Before 1994, § 2510(1)—and thus, the term "wire communication"—expressly did not include "the radio portion of a cordless telephone conversation that is transmitted between the cordless telephone handset and the base unit," *see id.* (pre–1994 version), but now it does, which means that § 2511(1) protected Tapley's conversations "regardless of [her] expectation of privacy." *Kinsey*, 1998 WL 704687 at * 1.

ment officers gain knowledge of the contents of an intercepted communication, [and become] aware of its unlawful interception, they may not use and disclose it"); *Berry v. Funk,* 146 F.3d 1003, 1012–13 (D.C.Cir.1998); *cf.* 18 U.S.C. § 2515 (expressly prohibits unlawfully intercepted communications from being used as evidence by courts "or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter").

Because Collins admitted to facts which, with presumed knowledge of the law, show he violated § 2511(1) both by "using" (i.e., listening to and hand-recording) Tapley's telephone conversations and "disclosing" them, plaintiff is entitled to § 2520(c)(2) damages against him. *See Dunn v. Blue Ridge Telephone Co.,* 868 F.2d 1578, 1582 (11th Cir.), *vacated per settlement,* 888 F.2d 731 (11th Cir.1989); *Ages Group, L.P. v. Raytheon Aircraft Co., Inc.,* 22 F.Supp.2d 1310, 1319 (M.D.Ala.1998).

▮ An argument exists that statutory damages are available only for each *day* that a defendant intercepts or discloses a telephone call, *Dunn,* 868 F.2d at 1582; *Bess v. Bess,* 929 F.2d 1332, 1333–34 (8th Cir.1991), and thus, the number of interceptions and disclosures occurring on each day is irrelevant. *See Goodspeed,* 39

F.Supp.2d at 794–95. Summary judgment therefore shall be granted to Tapley on Collins's §§ 2510/2511 liability, but the parties shall brief the Court on what, if any, damages[8] may be summarily awarded.[9]

In that Tapley seeks both general and statutory damages (in addition to punitive damages and statutory attorneys' fees), doc. # 1 at 9, the parties should also brief the Court on whether:

(a) she may pursue general damages to the exclusion of statutory damages and vice versa;

(b) statutory damages can be multiplied by the number of defendants, *see Abbott,* 1998 WL 433772 at * 15 (no);

(c) the Court has discretion to limit or even deny damages, *see id.* (no); *compare Goodspeed,* 39 F.Supp.2d at 790 ("the award of statutory damages under Title III is discretionary rather than mandatory"); *id.* n. 6 ("However, the Court's discretion is limited to awarding the full amount of statutory damages or no damages at all");

(d) each defendant—including Vidalia—can be held jointly and severally liable for any damages, *see Abbott,* 1998 WL 433772 at * 15 (yes);

---

8. "Under § 2520, a successful plaintiff may recover equitable or declaratory relief, actual damages or statutory damages of 'whichever is the greater of $100 a day for each day of violation or $10,000,' punitive damages, and reasonable attorney fees and costs. *See* § 18 U.S.C. 2520(a), (b), and (c)(2)." *Gaubert,* 1999 WL 10384 at * 1; *Huguenin v. Ponte,* 29 F.Supp.2d 57, 61 n. 8 (D.R.I.1998); *see also* Ann., *Construction and application of provision of Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C.A. § 2520) authorizing civil cause of action by person whose wire of oral communication is intercepted, disclosed, or used in violation of Act,* 25 ALR Fed 759 § 5.5

Where statutory damages are sought, "the plaintiff need not prove any actual harm." *Apampa v. Layng,* 157 F.3d 1103, 1105 (7th Cir.1998). The standard for punitive damages is discussed in *Scutieri v. Paige,* 808 F.2d

785, 792–93 (11th Cir.1987) and *Bess,* 929 F.2d at 1335. Tapley does not pursue punitive damages from Vidalia. Doc. # 2 (Interrogatory Response # 6); *see also Lewis v. Village of Minerva,* 934 F.Supp. 268, 269–72 (N.D.Ohio 1996) (municipalities cannot be held liable for punitive damages under § 2520(b)(2)).

9. Damages may be awarded both for unlawful use and disclosure of intercepted conversations. *See Poulos,* 11 F.3d at 290 (Federal wiretapping law prohibits more than just initial wrongful invasion; disclosure and/or use of information obtained through wrongful invasion amounts to separate injury prohibited by statute, and makes a person subjected to such disclosure and/or use "a victim, once again, of a federal crime") (cite omitted); *see also Dorris v. Absher,* 959 F.Supp. 813, 817–19 (M.D.Tenn.1997).

(e) the extent, if any, § 2520 damages might duplicate or otherwise preclude damages under Georgia's Wiretap statute;

(f) any forms and/or measurements of damages available under Georgia's Wiretap statute which are different from its federal counterpart.

Finally, the parties shall also brief the Court on the factors that guide the Court's discretion (assuming it exists) in awarding § 2520 damages. *See Goodspeed,* 39 F.Supp.2d at 791.

### (2) Georgia's Wiretap Statute

Given the more expansive wording contained in Georgia's Wiretap statute, *see supra* Part III(A) it is but a short step to conclude that Tapley is entitled to summary judgment against Collins on that claim. However, the parties shall brief the damages issues noted in Part III(D)(1) above.

### (3) Tapley's Invasion of Privacy Claim

■ Defendants point out that the "right to recover under an invasion of privacy theory is restricted where matters of public interest are involved." *Wilson v. Thurman,* 213 Ga.App. 656, 658, 445 S.E.2d 811 (1994) (quotes and cite omitted); doc. # 27 at 12. *Wilson,* however, is easily distinguishable because the public officials there acted on allegations of criminal conduct conveyed to them by a third party. 213 Ga.App. 656, 445 S.E.2d 811. In contrast, Collins himself violated federal and State law in producing the very product for which he now claims to have acted in the public interest.

Like the proverbial "chutzpah" character who murders his parents but then pleads for mercy because he's an orphan, defendant is estopped from claiming that

defense here. Yet, "Georgia law requires that the intrusion be physical, analogous to a trespass." *Troncalli,* 514 S.E.2d at 482 n. 3. Defendant Troncalli easily satisfied that requirement, but did Collins? The parties likewise shall brief this issue.

### E. Defendants Dixon and Torrance

### (1) Federal Wiretap Act

Defendants Dixon and Torrance essentially argue that they did not intercept or disclose any of plaintiff's telephone conversations, and their mere presence when Collins disclosed them to Owen does not confer § 2511 liability upon them. Doc. # 27 at 11. The distinction explored in *Thompson* and *Fields* applies here. "[I]t is not enough to show that a defendant merely knew he was using or disclosing information from an intercepted communication. It must also be shown that the defendant knew, inter alia, that neither party to the intercepted conversation had consented to the interception." *Thompson,* 970 F.2d at 749; *Fields,* 985 F.Supp. at 1313.

■ Here Torrance's liability is clear. He admits that Collins informed him of the conversations' contents and how they were intercepted. Torrance dep. at 10–12. He does not deny that he then summoned Owen and disclosed the substance of the conversations to him before he convened with Owen, Collins and Dixon. *Id.* at 15–16. And, he officially backed Collins in disclosing the conversations' contents to Owen in order to advance Collins's and Torrance's joint political objectives (i.e., to influence Owen's thoughts on whether Tapley would "hurt" the Vidalia/GBI "harmony" they sought—something both admit doing *after* being informed that Tapley was investigating Torrance).[10] Torrance dep. at 15–21.

---

10. Had Collins first publicly disclosed the illegally obtained conversation summary, Torrance could have used it, with impunity, for free-speech purposes. *See Boehner v. McDermott,* 1998 WL 436897 at * 4 (D.D.C.1998) (unpublished) (the "Newt Gingrich" conver-

sation); *Peavy v. New Times, Inc.,* 976 F.Supp. 532, 540 (N.D.Tex.1997). However, Torrance advances no First Amendment or other constitutional defense here. *See Peavy,* at 515–16.

Torrance thus joined Collins in exploiting the fruit of an unlawful eavesdropping—and he was fully informed of the underlying facts—in a joint undertaking to achieve a political end. Under black-letter, civil conspiracy principles,[11] liability is fairly imputed to him. Tapley therefore is entitled to summary judgment on her §§ 2510/2511 claims against him. *Cf. Bess,* 929 F.2d at 1334 (husband violated 18 U.S.C. § 2511 by reciting facts obtained from intercepted conversations in divorce proceeding). This includes both her "use" and "disclosure" claims. *See Peavy,* 37 F.Supp.2d at 511, 514; *Goodspeed,* 39 F.Supp.2d at 790.

Dixon occupies a somewhat different position. Before the meeting with Owen, Torrance simply informed him that Collins had intercepted Tapley's conversations, but did not then disclose to him their contents—nor how they were intercepted. Dixon dep. at 10; Torrance dep. at 19–20. At that subsequent meeting, however, Dixon learned of the conversations' contents, doc. # 25 ¶ 8; Dixon dep. at 11, agrees he then functioned as Vidalia's mayor, Dixon dep. at 11, and did not intervene to stop the actual disclosure and use of them. *Id.* at 11–12.

Were those the only facts, Dixon would be entitled to summary judgment, since his ignorance of the "illegal interception" facts would insulate him from liability. *See Fields,* 985 F.Supp. at 1313–14 (merely listening to allegedly illegally-obtained au-

diotape of private telephone conversations did not amount to "use" under § 2511). But Torrance testified that, during the Collins-Torrance-Dixon meeting with Owen, "we talked about how it happened on the scanner . . . ." Torrance dep. at 20–21. Dixon does not dispute this.

At that point Dixon—having been informed of the underlying facts necessary to impose §§ 2510/2511 liability upon him—should have (at a minimum) left the room, if not also insist (on behalf of the City) that Collins and Torrance desist from further use of Tapley's intercepted conversations. But he did not. Instead, he joined in his co-defendants' efforts to unlawfully use Tapley's conversations for political purposes. Under the same black-letter civil conspiracy principles, *see* supra note 11, he, too, is liable to Tapley for the use and disclosure of her telephone conversations. Tapley therefore is also entitled to summary judgment on her §§ 2510/2511 claims (both "use" and "disclosure") against Dixon. *See Peavy,* 37 F.Supp.2d at 511, 514; *Goodspeed,* 39 Supp.2d at 790.

**(2) Georgia's Wiretap Statute; Invasion of Privacy Tort**

Similar to the Court's holding on Collins, Tapley is entitled to summary judgment against Torrance and Dixon on her Georgia Wiretap statute claim, but the parties likewise shall brief the Court on the damages issue, as well as the common law ("*Yarbray*") invasion of privacy claim. Again, *see Troncalli,* 514 S.E.2d at 482 n. 3 ("Georgia law requires that the intrusion be physical, analogous to a trespass").

---

**11.** *See Savannah College of Art & Design, Inc. v. School of Visual Arts of Savannah, Inc.,* 219 Ga.App. 296, 297, 464 S.E.2d 895 (1995) (defendants could be held liable for their coconspirators' acts which occurred even before the defendants joined the conspiracy; "and anyone, after a conspiracy is formed, who knows of its existence and purposes and joins therein, becomes as much a party thereto . . . as if he had been an original member") (quotes and cite omitted). Here the undisputed evi-

dence shows that Torrance, after Collins informed him of §§ 2510/2511–liability imputing facts (i.e., that Collins had intercepted Tapley's telephone conversations and was disclosing them to third parties—Torrance himself, as well as Owen), joined Collins to "accomplish an unlawful end or to accomplish a lawful end by unlawful means" —by lending his official support to Collins's act of disclosing the substance of Tapley's private telephone conversations to her boss.

## F. Qualified Immunity

### (1) Wiretap Claims

The individual defendants **arguably** claim qualified immunity from §§ 2510/2511 liability. Doc. # 27 at 2–7 (failing to state whether they are raising the defense against Tapley's § 1983 claims, her §§ 2510/2511 claims, or both); *see also* doc. # 5 (Answer); # 33 at 5–7 (Status Report **again** failing to specify); doc. # 45, Part III (finally, in response to plaintiff's argument that qualified immunity is not a defense to a §§ 2510/2511, *see* doc. # 40 at 8, defendants contend that it is, thus **impliedly** raising the defense).

▮ The qualified immunity defense may be raised in response to claims based on statutes which vest certain federal *rights* in litigants. *See Doe, 1–13 By and Through Doe Sr. 1–13 v. Chiles*, 136 F.3d 709, 713 (11th Cir.1998) ("In *Maine v. Thiboutot*, 448 U.S. 1, 4–8, 100 S.Ct. 2502, 2504–06, 65 L.Ed.2d 555 (1980), the Supreme Court held that section 1983 can be used to vindicate violations of federal statutory rights"); *id.* (but "[i]n order to seek redress through § 1983 ... a plaintiff must assert the violation of a federal *right,* not merely a violation of federal *law*") (emphasis added).

▮ One invokes this defense by establishing that the allegedly unlawful conduct occurred while he was acting within the scope of his discretionary authority. "If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert Intern., Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir.1998) ("When a government official goes completely outside the scope of his discretionary authority, he ceases to act as a government official and instead acts on his own behalf.... For that reason, if a government official is acting wholly outside his discretionary authority, he is not entitled to qualified immunity regardless of whether the law in a given area was clearly established").

Collins has made no attempt to show that he was acting within his discretionary authority when he intercepted Tapley's telephone calls. This is not all that surprising, since it "is usually an uncontested issue and one which courts are liable to skip over in their analysis." *Williams v. Goldsmith*, 4 F.Supp.2d 1112, 1122 (M.D.Ala.1998) ("Skipping over it is not the result of mere laziness or negligence, however. Courts ignore the issue because the hurdle that the defendant must meet in showing that he was acting within his discretionary authority is a low, indeed almost invisible, one").

The case law, incidentally, shows that even conduct ultimately found to have violated the constitution (hence, be § 1983–actionable) can fall within the scope of an official's discretionary duties if it was "reasonably related to ... the outer perimeter of an official's discretionary duties." *James*, 157 F.3d at 1282; *see also Williams*, 4 F.Supp.2d at 1122 ("A defendant is not failing to act within his discretion merely because he or she is doing something unlawful. Indeed, if that were the test, why would the court even need to confront the issue of clearly established law? The two steps would be merely conflated into one. It is perfectly logical for a court to find that someone who was acting illegally was acting within his discretionary authority. That is why the court is called upon to decide if the official violated clearly established law (after the court finds the official was acting within his discretionary authority)").

Under that reasoning, Collins's subsequent contacts with Torrance, Dixon and Owen for the claimed purpose of furthering city-GBI harmony at least colorably fall within the "outer perimeter" of his duties, and the fact that such conduct violated §§ 2510/2511 would not derail that conclusion. The same must be said for defendants Torrance and Dixon. Again, however, none have argued this defense.

▮ Assuming they did, and successfully at that, then *Harbert* would shift the

burden to Tapley to show that the defendants violated clearly established law. "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions [at the time of the challenged conduct] by the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest state court of the state where the case arose." *Jenkins By Hall v. Talladega City Bd. Of Educ.*, 115 F.3d 821, 826 n. 4 (11th Cir.1997) (en banc); *accord Wilson v. Strong*, 156 F.3d 1131, 1135 (11th Cir.1998); *see also Rowe v. Schreiber*, 139 F.3d 1381, 1384 (11th Cir. 1998) ("If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant") (quotes and cite omitted).

Unlike the *Abbott* court, then, *see id.*, 1998 WL 433772 at * 12; *Abbott v. Village of Winthrop Harbor*, 953 F.Supp. 931, 937–38 (N.D.Ill.1996), this Court can not rely on extra-circuit case law. *Mastroianni v. Bowers*, 160 F.3d 671, 682 n. 9 (11th Cir. 1998) ("we cannot rely on case law from another circuit to determine whether the law was clearly established in this circuit"); *see also Barton v. Norrod*, 106 F.3d 1289, 1293 (6th Cir.1997) (extra-circuit cases clarifying constitutional right were not enough to deprive police officer of qualified immunity).

Still, the Eleventh Circuit "can imagine an exceptional case where the words of a federal statute or federal constitutional provision will be specific enough to establish the law applicable to particular circumstances clearly and to overcome qualified immunity even in the absence of case law." *Santamorena v. Georgia Military College*, 147 F.3d 1337, 1340 n. 6 (11th Cir.1998) (quotes and cite omitted). The comprehensive analysis of § 2511 above arguably shows that to be the case here. *But see* doc. # 31 at 3–4 n. 1.

In that respect, defendants at most claim that they failed to keep up with the law, and thus were ignorant of it. But under "clearly established" precedent an objective standard applies, *see Flores v. Satz*, 137 F.3d 1275, 1277 n. 4 (11th Cir.

1998), unless subjective knowledge and motive are critical elements of the alleged violation. *Id.* That isn't the case here. *See Nix*, 160 F.3d at 349–50 (presumed knowledge of the law will suffice). For that matter, other courts in Wiretap Act cases have had little problem denying qualified immunity. *See Abbott*, 1998 WL 433772 at * 14.

At bottom, however, it is not necessary to resolve the qualified immunity issue on Tapley's §§ 2510/2511 claims because she also raises a more dispositive argument: that, while "[q]ualified immunity may be a defense for a § 1983 claim[, it is] not for a § 2511 claim." Doc. # 40 at 8. If this contention is correct, then the Court need not even trifle with whether defendants proceeded under their discretionary authority, or whether the law was clearly established at the time.

Tapley is correct. One need only look back a short distance. Because Congress enacted no statutory defense to § 1983 claims, the U.S. Supreme Court created one, *see Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity), in much the same way that it created a parallel remedy and defense in *Bivens v. Six Unknown Named Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). But, just as no *Bivens* remedy exists where Congress already has created a comprehensive statutory scheme affording meaningful remedies against the United States, *Bush v. Lucas*, 462 U.S. 367, 374–90, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983), the same can be said for remedies and defenses in the Title III sphere.

In other words, in contrast to § 1983 claims, Congress *did* enact statutory defenses to §§ 2510/2511 claims. *See* Ann., 25 ALR Fed 759 § 6 (good-faith reliance defense). This led the *Funk* court to conclude that qualified immunity is not a Wiretap Act defense. *See id.*, 146 F.3d at 1013–14 ("because Title III itself provides a complete defense for [a] good faith reliance on ... a court warrant or order, a

grand jury subpoena, a legislative authorization, or a statutory authorization," the qualified immunity defense is not available) (quotes and cite omitted); *id.* ("When Congress itself provides for a defense to its own cause of action, it is hardly open to the federal court to graft common law defenses on top of those Congress creates"); *accord McClelland v. McGrath,* 31 F.Supp.2d 616, 619–20 (N.D.Ill.1998). This Court agrees.

### G. Tapley's 42 U.S.C. § 1983 Claims

While "qualified immunity" exists as a defense against § 1983 claims, the Court is forced to wonder what right Tapley associates with § 1983 that is not already redressed under §§ 2510/2511. Tapley cites only generic "due process" and "equal protection" constitutional claims. *See* doc. #1 ¶39; doc. #2 ("Interrogatory No. 6 Response") (referencing no particular constitutional right).[12]

For that matter, *Funk* can be read to at least question whether a § 1983 claim in this context should be dismissed as duplicative of, if not preempted by, §§ 2510/2511. *See Funk,* 146 F.3d at 1014–15; *cf. Lee v. Hughes,* 145 F.3d 1272, 1276–77 (11th Cir.1998) (given comprehensive statutory scheme established by Civil Service Reform Act, probation officer was precluded from raising *Bivens* claim against his supervisors), *cert. denied,* —— U.S. ——, 119 S.Ct. 1026, 143 L.Ed.2d 37 (1999); *Teel v. DiLeonardi,* 1999 WL 133997 at * 2 (N.D.Ill.1999).

The question often goes unresolved, and sometimes courts simply assume that § 1983 can be used to redress §§ 2510/2511 violations. *See Quigley,* 43 F.Supp.2d at 1183–84. The parties therefore shall brief this issue, too. Tapley should supply specific legal citation in support of any § 1983–redressable (e.g., constitutional) claims she might seek to raise.

### H. The City of Vidalia

The facts establishing Vidalia's liability are undisputed. The mayor, police chief and city manager acted in concert to use and disclose Tapley's telephone conversations to further Vidalia's political interest in working "harmoniously" with the GBI by disclosing the partially recorded contents of Tapley's conversations to her boss. Vidalia does not dispute that the three individual defendants were final policy makers for § 1983–liability purposes. *See Morro v. City of Birmingham,* 117 F.3d 508, 510 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1299, 140 L.Ed.2d 465 (1998); *Samarco v. Neumann,* 44 F.Supp.2d at 1285 (S.D.Fla.1999) ("For § 1983 liability to attach to a government entity, the official must possess the authority and responsibility for establishing final policy with respect to the issue in question") (quotes, cite and brackets omitted).

 Thus, while there is no *respondeat superior* liability under § 1983, *Monell v. Department of Soc. Servs.,* 436 U.S. 658, 690–91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Davis v. Zirkelbach,* 149 F.3d 614, 619 (7th Cir.1998), the concerted action among Vidalia's top policy makers suffices to affix § 1983 liability—if that remedy is available, *see* supra Part III(G)—to the City of Vidalia. *See Abbott,* 1998 WL 433772 at ** 17–18. And, this Court agrees with the *Abbott* court that simple *respondeat superior* principles can be applied to impose §§ 2510/2511 liability upon a municipality. *Id.* at * 14; *see also* §§ 2510(6), 2511(1), 2520(a) (amended in 1986 to include any "entity" as a party from which civil recovery is permitted); *Dorris,* 959 F.Supp. at 819–20.

 At a minimum, then, Tapley is entitled to summary judgment against Vidalia for her §§ 2510/2511 claims. *Abbott,*

---

12. Voice and sound recordings of an individual are interests that are protected by the Fourth Amendment. *See Katz v. U.S.,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), cited in *Lauro v. New York, N.Y.,* 39 F.Supp.2d 351, 363 (S.D.N.Y.1999) (staging "perp walk" for media violates arrestees' Fourth Amendment rights).

1998 WL 433772 at * 14; *compare Murphy v. Flagler Beach*, 761 F.2d 622, 630 (11th Cir.1985) (Under State's communication act's vicarious liability principles, city was not liable for its police chief's secret tape recording of meeting between chief and discharged officer; although certain city officials knew that city had purchased recording equipment for chief and that city employees had installed tape recorder in desk on city property, there was no evidence that city knew chief had done any illegal recording). Because her pleadings are unclear, Tapley shall brief the Court whether she intends to raise State law claims against the City.

## I. Emotional Distress

■ Defendants insist that Tapley advances no viable emotional distress claim. Doc. # 27 at 14. This is at best a "spongy" area of law. In any event, to

> succeed on the claim of intentional infliction of emotional distress, [Tapley] must establish all four of the following elements: (1) The conduct must be intentional or reckless; (2) The conduct must be extreme and outrageous; (3) There must be a causal connection between the wrongful conduct and the emotional distress; and (4) The emotional distress must be severe.

*Phinazee v. Interstate Nationalease, Inc.*, 237 Ga.App. 39, 514 S.E.2d 843, 844 (1999) (quotes, cite, punctuation and brackets omitted). Courts decide, as a matter of law, "[w]hether a claim rises to the requisite level of outrageousness and egregiousness to sustain a claim for intentional infliction of emotional distress...." *Id.* (quotes and cite omitted). However,

> [i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by malice, or a degree of aggravation that would entitle the plaintiff to punitive damages for another tort.

*Id.*

Rather, the offending conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (quotes and cite omitted); *see also O'Neal v. Home Town Bank of Villa Rica*, 237 Ga.App. 325, 514 S.E.2d 669, 674 (1999). What constitutes "outrageous" behavior nowadays is increasingly difficult to discern given society's increasing tolerance of it. *Compare* 9/9/98 Office of Independent Counsel's Referral to the U.S. House of Representatives Pursuant to 28 U.S.C. § 595(c) ("Starr Report") ("Narrative," Part B) (alleging graphic sexual conduct involving President Clinton) *with* http://www.pollingreport.com/clintjob.htm (site as of 3/26/99) (showing presidential approval rating never below 60% from 1/30/99 onward).

Courts therefore must compare each situation to prior case precedent. Thus, placing an unwrapped condom in a woman's salad at a restaurant may support an emotional distress claim, *see Chambley v.. Apple Restaurants, Inc.*, 233 Ga.App. 498, 499–500, 504 S.E.2d 551 (1998), but not threatening to "ruin" someone's reputation. *See Amstadter v. Liberty Healthcare Corp.*, 233 Ga.App. 240, 243, 503 S.E.2d 877 (1998) (Alleged conduct of health care services contractor in suddenly terminating contract with doctor to provide medical services to hospital, failing to respond to potential employers' inquiries about him, and threatening to "ruin" him by reporting him to National Practitioner Data Bank, did not give rise to level necessary to support claim for intentional infliction of emotional distress).

Tapley heavily relies upon *Yarbray.* Doc. # 40 at 10. Yarbray testified against Southern Bell in another employee's discrimination suit. 261 Ga. at 704, 409 S.E.2d 835. She claimed Southern Bell

"threatened that she would lose her job if she testified against the company, and, after she testified, retaliated by transferring her to an unsatisfactory employment situation." *Id.* The court held that Southern Bell's alleged retaliation, designed to punish Yarbray for ignoring its lawyer's admonitions and testifying against Southern Bell, as well as subjecting her to abuse by her supervisor and causing her severe emotional pain, would, if proved, meet the test of outrageousness under Georgia emotional distress law, and thus present a jury question. *Id.; see also Harris v. Procter & Gamble Cellulose Co.,* 73 F.3d 321, 324 (11th Cir.1996) (plaintiff's allegations that his employer threatened and retaliated against him for reporting hazardous exposure to toxic chemicals stated a claim for intentional infliction of emotional distress under Georgia law).

These cases show that a singularly outrageous act (e.g., dropping an unwrapped condom in a restaurant patron's salad) may support an emotional distress claim. Short of that, a *sustained* course of aggravated conduct aimed directly at a plaintiff may suffice, *see Troncalli,* 514 S.E.2d at 482, though this often is found where the victimizer enjoys some control (e.g., as an employer) over the victim. *See Mears v. Gulfstream Aerospace Corp.,* 225 Ga.App. 636, 640, 484 S.E.2d 659 (1997) ("As we previously have found, however, the existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist") (quotes and cite omitted).

Tapley in effect is arguing that Collins's conduct in intercepting and disclosing her conversations for political purposes may be equated to the intentional, privacy-invading conduct found to support an emotional distress claim in *Troncalli,* 514 S.E.2d at 481–82 (upholding privacy-invasion and emotional distress claim on evidence that defendant intentionally brushed up against female plaintiff's breasts; followed her in his car; made a threatening gesture at her; put his mouth on her neck; followed her when she tried to get away; and visited her house and knocked loudly on her door; his actions "were an unreasonable, offensive intrusion into her seclusion and solitude," and "a jury could find that [his] conduct ... was outrageous and extreme, rather than merely rude").

■ Here a jury could reasonably find that Collins intentionally invaded Tapley's statutorily protected privacy rights by knowingly intercepting her telephone conversations, then later disclosing them to Owen in order to retaliate against her for speaking ill of him. Similarly, the jury could further find that the defendants—out of pure political vengeance—collectively intended to misuse Tapley's private conversations behind her back in order to damage her professional standing and retaliate for bad-mouthing Collins and targeting Torrance. While all that may not be as outrageous as Troncalli's "stalking" and physical touching conduct, it can reasonably be compared to the employer's "emotional-distress" conduct in *Yarbray.*

Without *Yarbray,* Tapley's emotional distress claim would fail, for the defendants' conduct here is much less outrageous than the condom-dropping and unwanted sexual contact/stalking found in *Chamblee* and *Troncalli.* To that end, the Court would profitably cite *Peavy,* which also involved scanner/cordless telephone interceptions. There the court analyzed a similar emotional distress claim under Texas law and ruled against the plaintiffs. *See Peavy,* 37 F.Supp.2d at 522.

But the *Peavy* court did not have *Yarbray* to consider, and as one of the *Yarbray* dissents shows, 261 Ga. at 707, 409 S.E.2d 835, *Yarbray* lowered the bar for what qualifies as "outrageous" conduct in Georgia. *Id.* Although *Yarbray* is somewhat distinguishable because the defendant there was an employer and thus exercised some control over the plaintiff, the *Mears* court stressed that "special relationship" only as a factor that in some cases "may" make a difference. *Mears,*

225 Ga.App. at 640, 484 S.E.2d 659. Moreover, the heart of the "outrageous" conduct in *Yarbray* was, as Justice Fletcher's dissent emphasized, simply "Yarbray's allegation that [her employer] retaliated against her for testifying, [contained within] a threat implied in its attorney's statement [to her]...." 261 Ga. at 707, 409 S.E.2d 835.

Here a jury could find that much more offensive conduct than that occurred: (a) an intentional invasion of plaintiff's privacy when Collins intercepted three conversations; (b) a secret meeting where her adversaries again invaded her privacy by analyzing her conversations; (c) yet another violation of her privacy when those same adversaries disclosed the substance of her conversations to Tapley's boss in order to provoke an adverse employment result; and (d) that defendants cynically lied in claiming that their "only interest" was in seeking "harmony" between Vidalia and the GBI. These additional factors compensate for the lack of the *Mears/Yarbray* "special relationship" factor.

It is tempting to dismiss *Yarbray* as an aberration, especially since many post-*Yarbray* opinions arguably ignore the lowered threshold that it presents. Nonetheless, it is a Georgia Supreme Court decision binding here. *Veale v. Citibank, F.S.B.*, 85 F.3d 577, 580 (11th Cir.1996) ("In matters of state law, federal courts are bound by rulings of the state's highest court"), *cert. denied*, 520 U.S. 1198, 117 S.Ct. 1556, 137 L.Ed.2d 704 (1997). Because of *Yarbray*—which is inconsistent with pre- and post-*Yarbray* precedent and should be overruled—the Court must resolve its doubt in Tapley's favor. Hence, defendants' summary judgment motion against Tapley on this claim must be denied; a jury shall resolve this issue.

## IV. CONCLUSION

Plaintiff Vickey Horton Tapley's partial motion for summary judgment (doc. # 14) is **GRANTED** to the extent set forth above, while the defendants' motion for summary judgment (doc. # 24) is **DE-NIED**. Tapley's motion to partially quash defendants' subpoena (doc. # 22) is **GRANTED** without prejudice to defendants' reconsideration motion (detailing why, for example, Tapley's "bank information, leave balances," etc. are relevant; the relevancy of the matters sought seems even more doubtful in light of the above analysis).

In the meantime, the parties are directed to confer and discuss settlement within ten days of the date this Order is served, then report (by letter) to the Court on their progress. Absent settlement, the briefing ordered above, along with the reconsideration motion, is due within ten days after the parties' settlement conference. Any reply briefs must follow within five days thereafter. The Court will be available to assist settlement negotiations, but only if desired by **all** parties.

Finally, for each motion or brief filed under a protective order the Clerk has been limiting the corresponding docket entry to "sealed document," thus failing to specify the title of each document. Yet, nothing "sensitive" has been disclosed in the style of a given motion or brief that the parties have filed, and the Clerk's practice has needlessly burdened the Court. The Clerk therefore shall retroactively amend each docket entry to identify what has been filed, and similarly identify any future "sealed" documents.